620 So.2d 1051 (1993)
FLORIDA EAST COAST RAILWAY COMPANY, a Florida corporation, Appellant,
v.
DEPARTMENT OF REVENUE, State of Florida, Appellee.
No. 91-3921.
District Court of Appeal of Florida, First District.
June 18, 1993.
Rehearing Denied July 27, 1993.
*1052 Fred H. Kent, Jr. of Kent, Hayden, Facciolo & McMorrow, Jacksonville, for appellant.
*1053 Robert A. Butterworth, Atty. Gen., Tallahassee; C.A. Daw, Sp. Asst. Atty. Gen., of Chandler, Dillion & Allyn, Chartered, Boise, ID, Lee R. Rohe, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Florida East Coast Railway Company (FEC) appeals a final judgment upholding valuation of its railroad property by the Department of Revenue (DOR) for ad valorem tax purposes for the years 1987 and 1988. The primary issues for our consideration focus upon FEC's contentions: (1) that DOR's unit rule method of railroad assessment results in a "going concern" tax on the railroad which is unauthorized by law; (2) that the trial court imposed an improper burden of proof upon FEC because DOR's valuation failed to consider comparable sales, one of the eight criteria for assessment which must be considered pursuant to section 193.011, Florida Statutes (1987); and (3) that DOR's valuation was invalid because in utilizing the income approach to valuation, DOR failed to use the actual income of FEC, did not use the income of comparable railroads in computing the capitalization rate, and did not appraise FEC's property as of January 1 of the tax years in question. For the reasons that follow, we affirm the judgment of the trial court.
FEC is a Florida corporation which operates a railroad between Jacksonville and Miami, with total trackage in excess of 700 miles. FEC is a Class I railroad (based upon ICC classification) which means that it has gross annual revenues in excess of $93.5 million. The FEC is a wholly-owned subsidiary of Florida East Coast Industries, a publicly-held Florida corporation, which is listed on the New York Stock Exchange. FEC also owns real estate which is not used in connection with its railroad operation, the valuation of which is not at issue in this case.
DOR's valuation of the railroad for the year 1987 resulted in an assessed value of $207,902,000 reduced to a value of $190,902,000 after an administrative conference with DOR. The assessed value was then equalized as required by 49 U.S.C. § 11503, to arrive at a final value of $159,152,490. Similarly, the valuation for 1988 by DOR was $224,373,000, reduced to $181,577,000, and equalized pursuant to 49 U.S.C. § 11503 to $150,964,663.
Being dissatisfied with the 1987 assessment, FEC filed an action in the Circuit Court of Leon County seeking to set aside the 1987 assessment as unlawful, and seeking a determination by the court of the correct assessed value and the tax legally due on its property. A similar action was filed with respect to the 1988 valuation. Jurisdiction of the circuit court was invoked under the provisions of section 194.171, Florida Statutes (1987).
In its complaints, FEC alleged that its property had been assessed far in excess of its just value as determined pursuant to section 193.085, Florida Statutes (1987), the rules and regulations of the Department of Revenue, and the United States Code provisions above mentioned. The complaints also alleged that the assessments were so excessive and unjust as to be both discriminatory and confiscatory. Specifically, FEC alleged that DOR's actions in arriving at the assessments were in violation of sections 193.085, 195.027 and 195.032, Florida Statutes (1987), as well as the regulations of DOR, and Article VII, sections 1 and 4, Constitution of the State of Florida, and Article I, section 8 and the Fourteenth Amendment of the Constitution of the United States, and 49 U.S.C. § 11503, in that FEC was being invidiously discriminated against and denied equal protection under the law. The complaints further alleged that FEC had paid to DOR an amount in taxes equal to the just value of its property for the years in question.
The two cases were consolidated for trial, and the court heard testimony over a period of approximately one week, which included the testimony of expert witnesses for both sides, and voluminous exhibits, including the expert appraisers' written reports, schedules, mathematical calculations, and financial data relied upon by them in *1054 arriving at their appraisals. Although there were numerous points of dispute concerning DOR's valuation process, the two major points of concern raised by FEC during the progress of the hearing were that in arriving at valuation based upon the income approach, DOR did not capitalize FEC's actual earnings or income, but instead, through various techniques, arrived at the investor expected or "normal" earnings of FEC; and that in its valuation based upon the market approach, DOR failed to consider comparable sales of railroads, but instead based its valuation upon the stock and debt approach to value. FEC also made legal arguments, particularly in its motion for rehearing, objecting to DOR's valuation of the railroad as a "going concern," while purporting to be utilizing the unit rule method of valuation.
In the final judgment, the court determined that FEC had failed to carry its burden of proving, by the greater weight or preponderance of the evidence, that the appraisal of DOR could not be supported by any reasonable hypothesis. Accordingly, FEC failed to overcome the presumption of correctness attaching to DOR's valuations, and the relief sought by FEC was denied.

I.

"GOING CONCERN" TAX
FEC argues that the unit rule method of assessment used by DOR does not result in the assessment of FEC's property,[1] but rather, determines the value of the entire railroad as a "going concern," which includes not only the value of FEC's property, but also measures the efficient use of its land and equipment, the management skills of its supervisors, and the quality of service rendered by its employees.
While acknowledging the existence of DOR's duly promulgated rules authorizing a unit rule method of assessment[2] FEC nevertheless contends that there is no statutory authority for this method of assessment. Here, FEC argues that while the statute relied upon by DOR as authority for its rules, section 193.085(4), is a valid statute, the statute simply does not authorize a unit rule or "going concern" valuation of railroad property.[3] Alternatively, FEC contends that if DOR's interpretation of section 193.085(4) is accepted as providing legislative authority for a "going concern" tax on railroads, the statute would be in violation of the "single subject" rule of Article III, section 6, Florida *1055 Constitution,[4] and would also be in violation of Article VII, section 4, which requires that tax laws secure a "just valuation" of property for ad valorem taxation.[5]
We find these and FEC's other arguments addressed to the "going concern" issue without merit.[6] First, we think it is appropriate to dispose of FEC's contention that the unit rule method of valuation, even if authorized by Florida law, does not authorize a "going concern" valuation as used by DOR's appraiser, Mr. Ziegler. Examination of the testimony of FEC's appraisal expert, Mr. Moore, reveals that he used the same unit rule method of valuation as did DOR's expert. Mr. Moore was questioned and gave answers on cross-examination as follows:
Q. First, I would like to ask you a couple of conceptual questions about your appraisal of the Florida East Coast Railroad.
Did you appraise it as a unit under the unit rule in Florida?
A. Yes  the railroad?
Q. Yes.
A. Yes.
Q. And in doing so, did you value all of the real and personal property, all the tangible and intangible property?
A. As far as we know, we took into account all of the factors that the law requires, yes. We valued it, the railway as an operating railroad.
Q. As a going concern?
A. As an operating railroad.
Q. That is not my question. Did you value it as a going concern?
A. We valued it as a going railroad. It was operating as a railroad, and we valued it on the unit value basis.
Q. Did you value specifically its franchise and its location and its competitive position?
A. We took into account, Mr. Daw, all of the factors which, in our opinion, would lead us to a fair value for the railroad. That included all aspects, some of them  most of them tangible, some of them intangible.
Thus, the unit rule method approach, as interpreted and utilized by FEC's expert, was indistinguishable from the approach used by DOR's expert. While the agreement on the use of this method of assessment by both parties' experts does not establish the legality of its use, FEC's argument that DOR's assessment by this method was not in accordance with Florida law is seriously undermined.
We think FEC's position is further undermined by the long history of unit rule assessment of railroads both in Florida and in most of the other states. As stated in Simpson v. Loftin, 160 Fla. 20, 33 So.2d 230, 232 (1948):
The gist of the unit system of taxation as so defined, requires that the value of the railroad system as a whole, be first determined and such value is then apportioned *1056 or distributed on the basis outlined to the counties, districts, municipalities, and other governmental units. Its purpose is to treat the physical properties, intangible properties, and capital stock of the railroad as a unit for taxation and to distribute the assessed value thereof to the counties and other units of government in proportion to mileage. Such a system is in general use throughout the country and is approved by all the courts of last resort, including the Supreme Court of the United States. (Citations omitted).
Notwithstanding the approval of the unit rule method as illustrated by the above quotation from Simpson v. Loftin, and other early cases, FEC contends that with the adoption of a new Florida Constitution in 1968, and substantial revision of the taxation statutes, the unit rule method was abandoned. We are unable to agree.
FEC fails to point out what provisions of the 1968 Florida Constitution or the amended statutes wrought this change, and we have failed to discover such changes in our reading. Section 195.01, Florida Statutes (1941), which was in effect when Simpson v. Loftin was decided, provided for an annual return by railroad companies of the track and terminal facilities in each county and the locomotive engines, cars and other personal property used in the operation of the railroad, together with its value. The statute also authorized the Railroad Assessment Board, in the event the state comptroller found the returns incomplete or incorrect, to assess the properties, and further authorized the comptroller to apportion the value of the properties among the several counties through which the railroad ran, based upon the miles of track in each county. Simpson v. Loftin, 33 So.2d at 232.
Through revision and renumbering of the statutes in subsequent years, much of the substance of section 195.01 of the 1941 statutes became incorporated in subsection 193.085(4)(a), Florida Statutes (1987). This subsection provides for annual returns to DOR by "[a]ll railroad and railroad terminal companies maintaining tracks or other fixed assets in the state and subject to assessment under the unit rule method of valuation" (emphasis supplied), and further provides that DOR "shall make an annual assessment of all operating property,"[7] of the railroad, such assessment to be apportioned to each county "based upon actual situs and, in the case of property not having situs in a particular county, shall be apportioned based upon track miles." DOR is further directed by the statute to promulgate rules to ensure the proper valuation and apportionment of the railroad's property, including the form and content of returns.
Pursuant to section 193.085, DOR has promulgated rules which clearly prescribe a unit rule method of valuation for railroads. The unit rule method of valuation, which was used by DOR in assessing FEC's property, is defined by section 12D-2.001(8) as follows:
UNIT RULE METHOD OF VALUATION  An appraising method used to value an entire operating property, considered as a whole with minimal consideration being given to the aggregation of the values of separate parts. The rights, franchises, and property essential to the continued business and purpose of the entire property being treated as one thing having but one value in use.
In addition to the foregoing, rule 12D-2.006 also contains provisions specifying use of the unit rule method of valuation. Pertinent portions of the rule are found in subsections (1)(a) and (b), as follows:
(a) The Department shall examine the returns required by these regulations and such other information as the Department may obtain and shall determine the just value of the railroad and railroad terminal's entire operating system, whether located entirely within this State or partially within this State. Just value *1057 shall be determined by application of the unit rule method of valuation.
(b) In application of the unit rule method of valuation, the Department shall consider the value indications obtained from three approaches to the system value, i.e., (1) cost approach, (2) market or stock and debt approach, (3) capitalized earnings or income approach, assuming there is enough conclusive evidence within the respective approach to render it a valid indicator of value... .
It is also noteworthy that although many changes were made when the state adopted its 1968 Florida Constitution, the "just valuation" provision found in Article VII, section 4 was not new, since a similar provision is found in Article IX, section 1, Florida Constitution of 1885.
We think it is significant that in Department of Revenue v. General American Transportation Corporation, 521 So.2d 112 (Fla. 1988), the most recent decision addressing the assessment of railroads, the court specifically recognized the unit rule method of assessment in Florida, stating:
Under the provisions of section 193.085(4), Florida Statutes (1979), the cars of resident railroads are taxed by the unit rule method... .
Id. at 114.
Finally, although FEC contends that the unit rule method referred to in the earlier cases referred only to a "central assessment" of railroads, rather than a "going concern" assessment, as we have noted above, there is no record basis for a finding as to what difference in valuation, if any, would be produced by assessment under these two purportedly different approaches. We therefore conclude that the trial court properly rejected FEC's objections to DOR's "going concern" assessments.

II.

BURDEN OF PROOF  FAILURE TO CONSIDER COMPARABLE SALES
In the final judgment finding the tax assessments valid, the trial court undertook an evaluation of DOR's assessment in the light of the eight criteria set forth in section 193.011 and, using a "two prong analysis," first determined that the burden of proof upon FEC was dependent upon whether DOR considered the eight criteria set out in the statute, in which case the presumption of correctness favored DOR's assessment. The presumption of correctness, the court stated, could then be rebutted only by proof which negates every reasonable hypothesis of value consistent with the assessment, citing Schultz v. TM Florida-Ohio Realty Ltd. Partnership, 577 So.2d 573 (Fla. 1991); Florida East Coast Ry. Co. v. Green, 178 So.2d 355 (Fla. 1st DCA 1965). If DOR failed to consider any of the eight criteria, then, according to the court's ruling, FEC's burden of proof was to establish its values by a simple preponderance of the evidence. The second prong, according to the trial court, would be an analysis of whether FEC negated every reasonable hypothesis supporting DOR's valuations.
The trial court found, as to the first prong, that all of the eight criteria set out in section 193.011 were appropriately considered by DOR; and as to the second prong, that FEC had failed to overcome the resulting presumption of correctness in favor of DOR's valuations. More particularly, the court found that section 193.011(1), dealing with the "cash value" of the property, defined as what a willing purchaser would pay a willing seller, incorporates the three standard appraisal approaches to the valuation of property, which are the income, market (stock and debt) and cost approaches. The court also determined that DOR's evidence indicated that the income approach to valuation was considered the most significant and reliable indicator of value of FEC's property, as did the evidence presented by FEC. The court also noted that DOR determined value using the income approach through direct capitalization, which the court found was an accepted "unit-rule" valuation technique.
From the briefs and arguments on this point, we first observe that the parties *1058 generally agree with the trial court's "two-prong" analysis of the controlling law with respect to the burden of proof. FEC sharply disagrees, however, with the trial court's finding that DOR appropriately considered all eight criteria found in section 193.011, urging that Mr. Ziegler, DOR's appraiser, admitted that in preparing his valuation he did not look for comparable sales of railroads. This, FEC maintains, demonstrates his failure to consider the "cash value" criterion of section 193.011(1). FEC further takes issue with the trial court's ruling that the "cash value" criterion incorporates the three standard appraisal approaches to the valuation of property, asserting instead that this criterion contemplates only a "market" approach, and that only comparable sale information can be utilized to satisfy this criterion. Significantly, FEC does not disagree with the trial court's finding that the income approach to valuation was considered by both parties' experts as the most reliable indicator of value, nor does FEC disagree with the court's finding that the direct capitalization method of determining value under the income approach, as used by DOR, is an accepted "unit-rule" valuation technique.
We find FEC's arguments unpersuasive when considered in the light of the reasonable requirements of the statutes, as applied to the facts before the trial court. In arriving at "just valuation," as required under section 4, Article VII of the Florida Constitution, the property appraiser (DOR) is required by section 193.011 to take into consideration eight factors, the first being:
(1) The present cash value of the property, which is the amount a willing purchaser would pay a willing seller, exclusive of reasonable fees and costs of purchase, in cash or the immediate equivalent thereof in a transaction at arm's length.
Florida case law indicates, as argued by FEC, that where there are sales of comparable properties, the property appraiser, "must perform a standard appraisal using normal techniques." Bystrom v. Valencia Center, Inc., 432 So.2d 108, 110 (Fla. 3d DCA 1983). See also, Florida Rock Industries, Inc. v. Bystrom, 485 So.2d 442, 445-46 (Fla. 3d DCA 1986), and Ozier v. Seminole County Property Appraiser, 585 So.2d 357, 359 n. 2 (Fla. 5th DCA 1991). The court in Bystrom v. Valencia Center, Inc. was concerned with the weight and effect to be given to evidence of market value based upon comparable sales, as opposed to evidence indicating a lesser value based upon the "present use" factor stated in section 193.011(2). In that case, as in Florida Rock and Ozier, supra, there was ample evidence of comparable sales.[8]
In the case before us, although FEC's expert in his written appraisal report and in his testimony attempted to utilize sales information under the "market" approach, the record is devoid of evidence from which it can be determined that these sales could be considered as "comparable." The point is made quite succinctly in DOR's brief by quoting from four pages of the transcript of testimony given by Mr. Moore, FEC's expert appraiser. Mr. Moore admitted that he made no inspection of any of the railroad properties sold, and no analysis of the terminal cities served by these rail lines; that he knew nothing of the track structure or its condition, and did not know what, if any, rolling stock was included in any of the sales; that he knew nothing about whether the price paid in any sale was affected by slow orders, or by hazardous material exposures, or to what extent the price was affected by transfer of existing contracts, customer defections from reroutings on parallel lines, or use of other transportation carriers such as barge or truck lines. In fact, from our examination of Mr. Moore's entire testimony, we are unable to find evidence establishing that any of Mr. Moore's reported sales met the threshold requirement of comparability  the presence *1059 of a willing purchaser and a willing seller, in an arm's length transaction. The absence from FEC's brief of any discussion or analysis of these railroad sales which FEC categorizes as comparable to FEC is understandable, since the factual predicate for any such meaningful comparison does not appear in the record.[9]
Further, as pointed out by DOR's experts, the sales data used by Mr. Moore were of Class II and III, rather than Class I railroads, and FEC made no showing that Class I railroads sold at a time proximate to the assessment dates. Additionally, Mr. Goodwin, an expert in the field of railroad appraisal, testified for DOR that the sales reported by Mr. Moore were not of entire railroads, and that none represented sales of railroad properties comparable to that of FEC.
Finally, Mr. Ziegler, DOR's appraiser, testified that while he did not look for individual purchases and sales of railroads to obtain market approach data, he did use common stock prices in arriving at market value under the stock and debt approach. He stated, however, that it is extremely difficult to "come up with comparable sales," but that he did feel that he had "come up with comparable sales" in the sense that he did consider the stock and debt method.
Viewing the evidence in the light most favorable to DOR, as we must on appeal, we conclude that the trial court did not err in finding that DOR's appraisal satisfied all statutory requirements. As a mere observation, the evidence suggests that it may be at best difficult, and at worst impossible, to find comparable sales of entire railroads. Accordingly, aside from the fact that DOR's rule requires the use of the stock and debt method, it is not surprising that DOR's appraiser turned to the stock and debt approach in making his appraisal. As explained by the court in Union Pacific Railroad Company v. State Tax Commission of Utah, 716 F. Supp. 543 (D.Utah 1988):
The stock and debt approach is a substitute market approach. Because of the infrequent sales of railroad properties, the absence of an organized market for such properties and the lack of accurate, current information about sales of railroad properties as such, appraisers must look to a substitute source for accurate information. There is an organized market for the purchase and sale of fractional ownership interests in railroad properties; shares or ownership interest in debt, bonds and such are bought and sold with some regularity. A specialist in dealing with such shares on an organized exchange `makes a market' for them... . An appraiser uses such market information as some indication of value. (Emphasis in original).
Id. at 548.
Of course, we need look no further than the decision of this court in Florida East Coast Ry. Co. v. Green, supra, to find that Florida has long used, with court approval, the stock and debt method to determine the value of railroad properties for tax assessment purposes. Furthermore, the trial court in the case before us had expert testimony that the stock and debt method was accepted by appraisers of railroad property. We reject FEC's contention that the "market" approach criterion of section 193.011(1) is not satisfied, in an appropriate case, by the use of the stock and debt method. Here, DOR's rule 12D-2.006 specifically mandates the use of this method, and DOR's expert evidence of value based upon this method was admitted at the trial below without objection.[10]
We reject, therefore, FEC's contention that by using stock and debt, rather than comparable sales, DOR failed to consider all the criteria mandated by section *1060 193.011. Although it may not be necessary to our decision, we also note our disagreement with FEC's contention that in the assessment of railroads, compliance with section 193.011(1) can be accomplished solely by consideration of comparable sales. As aptly stated by the court in Vero Beach Shores, Inc. v. Nolte, 467 So.2d 1041, 1042 (Fla. 4th DCA 1985):
While all of the statutory factors must be considered in making an appraisal under the statutory scheme, they may be variously weighted by the appraiser or discarded entirely where they are not, under the circumstances, probative of present value.
In the case before us, DOR assessed FEC's property pursuant to DOR's duly promulgated rule, the constitutional validity of which has not been challenged below or on appeal, utilizing stock and debt as a substitute market approach; and both expert appraisers testifying for DOR stated that this was an accepted appraisal method for determining the market value of railroad property.
Accordingly, we find that the trial court correctly found that DOR considered all of the eight statutory criteria in making its assessments, and that the burden of proof was upon FEC to overcome the presumptive correctness of the assessments. Moreover, we agree with the trial court's further conclusion that FEC failed to overcome the presumption of correctness which attached to DOR's appraisal, a conclusion well-supported in the record. Significantly, even though FEC's attempted use of comparable sales was ineffective, as above indicated, DOR's value was still within the range of values reflected by FEC's sales information.

III.

FAILURE TO CONSIDER "ACTUAL" INCOME
FEC argues that DOR's appraiser, Mr. Ziegler, used false income figures in his capitalization formula, resulting in a higher valuation. FEC's net operating income for 1987 was $18,819,235. Mr. Ziegler used a "typical" adjusted net income figure of $19,400,000, about $600,000 higher than FEC's actual income for that year. For 1988, FEC's net operating income was $19,418,000. Mr. Ziegler used an adjusted income figure of $20,683,618, or $1,265,000 higher than actual income. As noted by FEC, Mr. Ziegler testified that he was trying to emulate the typical buyer by forecasting income. He explained:
If an investor is trying to buy a railroad, he wants to make a reasonable estimate of what future income he is going to receive from that business, and he wants to try to determine what is the income as of the end of that year, a reasonable income to be used to capitalize.
In the final judgment, the court found that DOR's use of the investor expected or "normal" earnings of FEC, rather than its actual earnings, was not a departure from the statutory criteria, and that this was also an approved technique used by appraisers in this field. As to the requirement of section 193.011(7), the consideration of the income from the property, the court found that DOR did obtain and did consider the actual earnings of the property, and having done so, the requirements of the statute were satisfied. In other words, the court found, although the statute mandates that the actual income be "considered," the statute does not require that actual income be used in the capitalization formula used by DOR's appraiser in arriving at value of the property.
We find no error in the trial court's ruling on this point. FEC's contention that the property appraiser must use actual income of the property for the year of the assessment is not borne out by the case law cited. In Bystrom v. Hotelerama Associates Ltd., 431 So.2d 176 (Fla. 3d DCA 1983), the court affirmed the trial judge's ruling that the presumption of validity of the assessment was overcome when the property owner proved that the taxing authority failed to obtain, although available, actual income data on the assessed property when utilizing an income approach to valuation, and did not make up for this deficiency by alternative methods. In Bystrom v. Equitable Life Assurance Society *1061 of United States, 416 So.2d 1133 (Fla. 3d DCA 1982), the court held that actual income of the property is relevant in reaching a valuation that conforms to the willing buyer-willing seller concept. Significantly, the Equitable decision found that the trial court erred in excluding the taxing authority's use of actual income in forecasting the income of the property, which the taxing authority's witness testified was necessary in arriving at just valuation under the income approach.
In the present case it is undisputed that DOR's appraiser received and considered FEC's actual income figures for the years in question. It is equally clear that the requirement of section 193.011(7), that the property appraiser must "take into consideration" the "income from said property," was fully satisfied. As explained by the court in Valencia Center, Inc. v. Bystrom, 543 So.2d 214, 216-7 (Fla. 1989):
In arriving at fair market value, the assessor must consider, but not necessarily use, each of the factors set out in section 193.011. (Citation omitted). The particular method of valuation, and the weight to be given each factor, is left to the discretion of the assessor, and his determination will not be disturbed on review so long as each factor has been lawfully considered and the assessed value is within the range of reasonable appraisals. (Citation omitted).
We find helpful to an understanding of this issue the following discussion from a current appraisal text cited and quoted in DOR's answer brief concerning the use of income:
To apply any capitalization procedure, a reliable estimate of income expectancy must be developed. Although some capitalization procedures are based on the actual level of income at the time of the appraisal rather than a projection of future income, an appraiser must still consider the future outlook. Failure to consider future income would contradict the principle of anticipation, which holds that value is the present worth of future benefits. Historical income is significant, so is current income, but the ultimate concern is the future. The earning history of a property is important only insofar as it is accepted by buyers as an indication of the future. Current income is a good starting point, but the direction of income and the expected rate of change are critical to the capitalization process.
The Appraisal of Real Estate, Ninth Ed., Ch. 19, P. 429 (A.I.R.E.A. 1987). Florida case law supports the principle that future income is the determinant of present value. See, e.g., Schultz v. TM Florida-Ohio Realty Ltd., 577 So.2d 573 (Fla. 1991); Bystrom v. Equitable Life Assurance Society of United States and Bystrom v. Valencia Center, Inc., supra.
We conclude, from our consideration of the arguments and authorities discussed above, that the trial court did not err in deciding that DOR's appraisal appropriately took into account the income factor in valuing FEC's property.

IV.

CONCLUSION
We have considered FEC's additional arguments, including its contentions that DOR's appraiser did not consider railroads comparable to FEC in determining a capitalization rate used in the income approach, and in the stock and debt approach; and that DOR's appraisal method could not result in a value of FEC's property as of January 1 of the tax year, as required by statute. Here, FEC focuses upon DOR's use of financial data relative to Class I railroads, contending that FEC is "out of league" with these railroads, and that Class II and Class III railroads are more comparable to FEC and should have been considered. On these and other issues voluminous testimony and extensive argument was presented and considered by the trial court, and we do not presume to have such expertise as would permit us upon mere examination of the cold record to second-guess the trial court's evaluation of the evidence and rendition of judgment. On appellate review we are guided by the rule that the trial court's findings of fact and conclusions of law are presumptively *1062 correct and will not be overturned unless they are clearly erroneous. Zinger v. Gattis, 382 So.2d 379 (Fla. 5th DCA 1981); and Neimark v. Abramson, 403 So.2d 1057 (Fla. 3d DCA 1980). The judgment of the trial court is, accordingly,
AFFIRMED.
SMITH, ALLEN and WOLF, JJ., concur.
NOTES
[1] In support of this argument, FEC relies in part upon expressions to this effect found in ITT World Communications v. San Francisco, 37 Cal.3d 859, 210 Cal. Rptr. 226, 693 P.2d 811 (1985), and County Board of Arlington County v. Common Wealth of Virginia, Department of Taxation, 240 Va. 108, 393 S.E.2d 194 (1990). In ITT, the court stated:

[W]e conclude that unit taxation is properly characterized not as the taxation of real property or personal property or even a combination of both, but rather as the taxation of property as a going concern. (Emphasis in original).
In the County Board decision, the court noted the incompatibility of the unit approach with the Virginia system of taxation of railroad properties, citing the ITT decision and quoting that court's observation that the unit method is "simply not real property taxation either in substance or in form." Id. at 197.
Our review of the ITT decision convinces us that while the court's characterization of "unit taxation" was pertinent to the issue being decided, the case does not involve the taxation of railroads, and does not disapprove the use of unit rule assessment such as employed by DOR in the case at bar. In County Board, the court invalidated an assessment based upon the unit method because that method of appraisal did not determine the fair market value of the railroad's property in its particular location as required by the Constitution of Virginia. In footnote 4 of its opinion, in response to the taxing authority's argument that the unit method was in use in a number of other states, the court observed that no citation had been given of jurisdictions with constitutional and statutory provisions similar to those in Virginia; and that neither Virginia's constitution nor its statutes contain any reference to the unit method of assessing real estate of public service corporations.
[2] See Rule 12D-2.001(8), and 12D-2.006, F.A.C. Significantly, the complaints filed by FEC in the circuit court contain no reference to the existence or validity of these rules.
[3] FEC argues that section 193.085(4) at most authorizes only a "central assessment" of railroad property, which FEC maintains is distinct from a unit rule method of assessment.
[4] FEC's "single subject" argument is misplaced. The statute in question, section 193.085, has been codified and reenacted for publication in the Florida Statutes. Article III, section 6 does not require sections of the Florida Statutes to conform to the single subject requirement. Santos v. State, 380 So.2d 1284 (Fla. 1980).
[5] As noted by FEC in its brief, "just value," as used in the Florida Constitution is synonymous with "fair market value." Powell v. Kelly, 223 So.2d 305, 308 (Fla. 1969), and Walter v. Schuler, 176 So.2d 81 (Fla. 1965).
[6] FEC contends, among other things, that DOR's valuation resulted in double assessment of certain of its intangible personal property, which is subject to separate assessment under Chapter 199, Florida Statutes; and that its exempt intangible property is being assessed and taxed, since the "going concern" valuation includes intangibles such as franchises, good will and other rights, contrary to the two (2) mills limitation of Article VII, section 2, Florida Constitution, and that it exceeds the 1.5 mill rate imposed on all other taxpayers under section 199.032, Florida Statutes.

As to the "double taxation" argument, the record does not support this claim. Neither does the record support FEC's contentions with regard to the assessment of exempt intangible property, since there is no evidence of a separate valuation of exempt intangibles, the only reference to such intangibles being in the testimony of the expert witnesses for DOR and FEC to the effect that their valuations of the railroad as a "going concern" included the value of all real and personal property used in operation of the railroad viewed as an entity, with such franchises and agreements as were essential to its operation.
[7] The term "operating property" is defined in the statute as including all property, rights of way, tracks, rolling stock, etc., "and other property directly related to the operation of the railroad." Section 193.085(4)(a), F.S.
[8] It is noteworthy that in Bystrom v. Valencia Center, Inc., the court pointed out, albeit parenthetically, that "market" evidence could mean either sales or income data. This contradicts FEC's somewhat categorical argument that the "market" approach contemplates only the use of comparable sale information. Significantly, the evidence in the case before us established that the stock and debt method was an accepted alternate "market" approach.
[9] Mr. Moore's written appraisal reports contain tables listing the purported comparable sales. However, these listings include only the names of the purchasers and sellers, the gross annual revenues of the railroad in question, the miles of trackage involved in the sale, and the purchase price paid.
[10] In fact, FEC's expert, Mr. Moore, also arrived at a value of FEC's property using this method, although he did criticize its use.