664 So.2d 284 (1995)
Ernie MASTROIANNI, Property Appraiser of Duval County, Florida, and Lynwood Roberts, Tax Collector of Duval County, Florida, Appellants,
v.
BARNETT BANKS, INC., Appellee.
Nos. 94-2518, 94-2520.
District Court of Appeal of Florida, First District.
November 16, 1995.
Rehearing Denied December 21, 1995.
*285 John A. DeLaney, General Counsel, and Lee S. Carlin and David K. Ray, Assistant General Counsel, Jacksonville, for Appellants.
Thomas M. Jenks, of Pappas Metcalf & Jenks, Jacksonville, for Appellee.
ZEHMER, Chief Judge.
The Property Appraiser and the Tax Collector of Duval County appeal a final judgment in two consolidated cases involving the property tax assessment of the Barnett Center, a high-rise office building in downtown Jacksonville, for the years 1992 and 1993. We reverse because the trial court improperly substituted its finding of fair market value for that of the property appraiser, where the record shows that the property appraiser, following the law, could conceivably and reasonably have arrived at the challenged appraisal value.
The county property appraiser assessed the Barnett Center at $70,310,800 for 1992 ad valorem tax purposes. The Value Adjustment Board denied the petition challenging the assessment and Barnett Banks, Inc. paid the taxes under protest. Barnett then filed a complaint alleging that the property appraiser had failed to consider each of the factors in section 193.011 and seeking a determination of the just value of the property and an order for refund of the difference in the tax paid and the tax due.
The property was sold by Jax Plaza Associates, Ltd., the developer, to Barnett Banks, Inc. for $58,758,585.94 in December 1992. At the time of the sale, Barnett Banks, Inc. was a 25% limited partner in Jax Plaza Associates, Ltd. and had a lease of 40% of the building space. The lending banks, one of which was Barnett Banks of Jacksonville, a wholly-owned subsidiary of Barnett Banks, Inc., were owed $98,929,730 on the construction loan.
For 1993 ad valorem tax purposes, the property appraiser assessed the property at $65,949,204, but the Value Adjustment Board granted the petition challenging the assessment, lowering it to $60,000,000. The county filed a complaint to reestablish its original 1993 assessment and the two cases were consolidated for bench trial.
At the final hearing, Robert Austin, the commercial appraiser primarily responsible for the 1992 and 1993 assessments, testified that he reached both assessments by using the income appraisal methodology known as direct capitalization, after considering and discarding the cost approach and market approach methodologies. He considered the size of the property in running the cost approach (the gross building area plus the size of the land) and the income approach (the net rental area). He considered the assessed values of similar sized property downtown, but concluded that the most comparable sale was "too inferior to reasonably adjust." He did not consider sales outside of Duval County because he did not feel he knew enough about those markets. He ran the cost approach, using a computerized national valuation system and the assessment of the land, but he testified that he did not rely upon it "because the cost approach is not a good indicator of economic obsolescence." He explained that economic obsolescence was the difference between the values derived from the income approach and from the cost approach, minus the functional and physical obsolescence. He considered the condition of the property, noting that it was the premier office building in Jacksonville, a portion of which was unfinished. The cost of finishing the building was taken into account in both the income and cost approaches. He considered the income and expense analysis supplied by the owner of the property for 1992. He testified that for 1993, the owner had supplied an appraisal by Charles Rogers. He compared the actual expenses of the property to the Institute for Real Estate Management's (IREM) survey on expenses for urban office properties, as well as to the income and expense information on forms returned to the appraiser by local highrise office buildings, and arrived at what he believed to be an accurate estimate of the expenses for the stabilized property. He considered the December 1992 sale of the property, but stated that it would not have had an impact upon his 1992 valuation because he did not consider it to be an "arm's-length transaction," since Barnett Banks, Inc., the *286 grantee of the property, was also involved in the loan participation and the ownership.
For the income valuation, Austin first determined the potential gross income of the property, using the 1992 income and expense analysis from the property owner which showed a $19.50/sq.ft. rental rate. A city-wide survey of rental rates for Class A buildings gave a range of $16-$23.50/sq.ft. and the Barnett Center was advertising a rate of $23.53/sq.ft. at that time. He used a rate of $20/sq.ft. A survey of Class A office buildings in Duval County run by a national real estate consulting firm indicated a vacancy rate of approximately 16% for the downtown area in 1992. For 1992, Mr. Austin assumed a vacancy and collection percentage of 15%, although he was aware that the actual vacancy at the Barnett Center on January 1, 1992, was 38-40%. For 1993, he assumed a vacancy and collection percentage of 20%, although the actual vacancy at the Barnett Center on January 1, 1993, was 30%. In considering the factors for deriving just valuation under section 193.011, he concluded that the property was being put to its highest and best use as an office building. He took into consideration the location of the property, noting that "it doesn't get a whole lot better as far as location goes." He estimated other income attributable to the property and got an effective gross income of $11,696,662. The property owner had reported operating expenses of $3.35/sq.ft. for 1992; he used an expense rate of $4.25/sq.ft., based on the building's age and design and a survey which indicated expenses in the range of $4.06-$6/sq.ft., exclusive of taxes. He arrived at a net operating income of $8,912,717 which he capitalized at an overall rate of .1171, giving him an indicated value of $76,110,386. Subtracting $5,799,565 for the unfinished space, he got an assessed value of $70,310,821. The procedure was basically the same for the 1993 assessment, with the exception of the vacancy rate.
Charles Rogers, the real estate appraiser hired by Barnett Banks, Inc. to render an opinion as to the just value of the property for the two appraisal periods, described the three recognized appraisal methodologies (the cost approach, the market or sales comparison approach, and the income approach) and the process of reconciliation (weighing the three approaches by analyzing the good and bad points of each). He stated that for a building which had never reached stabilized occupancy, the most used income approach in the appraisal industry was the discounted cash flow method. He explained:
... That is to take it from a point at where it is in occupancy and in income level up to a stabilized point that it will reach in the future. To do this, we take in a series of cash flows of all those years and discount all of that back to the present value that it is now worth... .
He testified that each of his appraisals ($55 million on January 1, 1992, and $60 million on January 1, 1993) contained an analysis of all three approaches, took into account each of the eight factors in section 193.011, and was based upon data that is customarily relied upon by professional fee appraisers in the area. He testified that the county appraiser had not relied upon the cost approach or the market approach in the 1992 and 1993 valuation work-ups, and had not come to final figures using either approach, but instead used a direct capitalization technique, an appraisal method properly used only when the property is "stabilized," but that the Barnett Center had not reached stabilized occupancy prior to either appraisal. He was asked what the biggest difference was between his discounted cash method and the county's direct capitalization method:
... The biggest difference is they have stabilized the income at 80 percent. The occupancy at that time was 61 percent. It never had been 80 percent. So by doing this they have projected a value that's going to take place in the future when the property is 80 percent occupied... .
He opined that the property appraiser's methodology did not reflect the actual conditions at the Barnett Center, because the direct capitalization computations did not take rent loss into account, made no adjustment to reflect the actual vacancy rates and their effects on the property's income, the appraisals did not fall within the reasonable range for the property, and they were not supported by any reasonable hypothesis of *287 value. He stated that he believed the property appraiser acted arbitrarily in assessing the Barnett Center for 1992 and 1993.
Robert Austin testified that he does not use the discounted cash flow method of valuing property in assessing income properties and that the property appraiser's office has a specific policy against using the discounted cash flow methodology. When asked about Rogers' comparable sales approach, he testified that there was "a little more to the [unhealthy property] sales than was just basically stated in the appraisals" and that those sales should have been adjusted upwards because they were inferior to the subject property.
Douglas Drozd, the chief appraiser for the county property appraiser's office, testified that he had audited the appraisals of six counties for the Department of Revenue and that the Department utilized and promulgated the direct capitalization methodology for income, as well as several "residual type techniques" which could also be characterized as direct capitalization techniques. He identified a June 8, 1988, Department memo issued to all property appraisers advising against using the discounted cash flow method, which he interpreted as meaning that the discounted cash flow method was not proper and should not be used. He stated that his office uses the discounted cash flow method only in certain limited circumstances, as a check against other approaches. When the trial judge asked if he would still use the market occupancy rate of 80% if the building were 96% occupied, Drozd replied in the affirmative, then explained:
In the simplest terms, what we're required to do is take a snapshot of each property as of January 1. We don't have any choice in that matter. That's what we do. And we look at the conditions of the market on that day. And each appraiser is required to analyze the actual numbers for each property and to compare it to the market. And when the appraiser does that, he has to make certain judgments about deviations from the market, why that exists. So he knows how to treat the different things. So I can't say in and of itself occupancy alone is going to affect the bottom line.
....
When we use the market, that gives us a direct reflection of the conditions at that time. And I think we're prevented from going into hypothesizing about the future or about things that we have no knowledge (sic) because it would tend to get us off course.
In the final judgment, the trial court ruled that the December 1992 sale of the property was an "arm's length" transaction and that the property appraiser's assessments did not enjoy a presumption of correctness because he "did not legally consider the present cash value factor" in section 193.011. The court found that there were comparable sales available for consideration and that the property appraiser therefore "should have performed a standard appraisal using standard techniques which means that all three of the recognized appraisal methodologies should have been employed in calculating a final assessed value," citing Florida East Coast Railway Company v. Department of Revenue, 620 So.2d 1051 (Fla. 1st DCA), rev. denied, 629 So.2d 132 (Fla. 1993). The court concluded that the property appraiser also "failed to legally consider the condition of the property factor," citing Muckenfuss v. Miller, 421 So.2d 170 (Fla. 5th DCA 1982), pet. for review denied, 430 So.2d 451 (Fla. 1983), and "failed to legally consider the income factor," citing Bystrom v. Hotelerama Associates, Ltd., 431 So.2d 176 (Fla. 3d DCA), pet. for review denied, 441 So.2d 631 (Fla. 1983), when he chose to ignore the actual levels of occupancy in the building.
Finally, the trial court concluded that even if the presumption of correctness had been applicable to the 1992 and 1993 assessments, "Barnett overcame the presumption by showing that the assessments were not supported by any reasonable hypothesis of value consistent therewith," citing Florida East Coast Railway Company. The stated basis for this conclusion was that Rogers's appraisals employed all three valuation methods and the property appraiser's assessed values did not fall within the range of reasonable appraisals set by Rogers, citing Schultz v. TM Florida-Ohio *288 Realty Ltd. Partnership, 577 So.2d 573 (Fla. 1991), and Valencia Center, Inc. v. Bystrom, 543 So.2d 214 (Fla. 1989). Based on Rogers's appraisals, the court found that the reasonable value of the Barnett Center was $55 million as of January 1, 1992, and $60 million as of January 1, 1993, citing Countryside Country Club, Inc. v. Smith, 573 So.2d 14 (Fla. 2d DCA 1990), rev. denied, 583 So.2d 1034 (Fla. 1991).
The trial court improperly substituted its finding of the fair market value of the property (based on the Rogers appraisal) for the property appraiser's determination of fair market value. In Blake v. Xerox Corp., 447 So.2d 1348 (Fla. 1984), the Florida Supreme Court stated that the trial court should merely determine "whether the appraiser, following the law, could conceivably and reasonably have arrived at the appraisal value being challenged." If an assessment is supported by any reasonable hypothesis of legality, it cannot be overturned by a mere showing that a lower valuation is more reasonable. Here, the property appraiser followed the policy and directives from the Department of Revenue in making the appraisal.
The trial court determined that the presumption of correctness accorded the property appraiser's assessment did not apply in these cases because the appraiser did not "legally consider" three of the factors set out in section 193.011. As to the first factor, the "present cash value" of the property, the record indicates that the appraiser did consider each of the three recognized approaches to valuation, and that he chose to use only the income approach because there were no local comparable sales upon which to base the market approach and because the cost approach "is not a good indicator of economic obsolescence." There is no legal requirement that the appraiser use all three approaches, only that he consider them. The trial court also found that the property appraiser did not "legally consider" the "condition of the property" and the "income from said property" because he used an average occupancy rate for downtown Jacksonville office buildings of the same class as the Barnett Center instead of the property's actual occupancy figures. However, the record indicates that the appraiser did consider the condition of the property and the income from the property. There was no showing that actual occupancy figures must be used in determining value by the income approach in order for the valuation to be valid. As long as available actual figures are considered, the decision whether it is reasonable to use them falls within the administrative discretion of the property appraiser. See Schultz v. TM Florida-Ohio Realty Ltd. Partnership; Valencia Center, Inc. v. Bystrom; Blake v. Xerox Corp.
Accordingly, we reverse the final judgment of the trial court and remand with directions to reinstate the original assessments made by the county property appraiser.
REVERSED and REMANDED.
KAHN and DAVIS, JJ., concur.