676 So.2d 812 (1996)
The KANSAS CITY SOUTHERN RAILWAY COMPANY, Successor in Interest by Merger to MidSouth Corporation, MidLouisiana Rail Corporation, Mid-South Rail Corporation, SouthRail Corporation and Tennrail Corporation
v.
LOUISIANA TAX COMMISSION, Malcolm B. Price, Jr., Chairman of the Louisiana Tax Commission, Valery A. Lowery and Kenneth P. Naquin, Jr., Members of the Louisiana Tax Commission.
No. 95 CA 2319.
Court of Appeal of Louisiana, First Circuit.
June 28, 1996.
Rehearings Denied August 6, 1996.
*814 Hilton Bell, John W. Colbert, Mark P. Dauer, New Orleans, for Plaintiff-Appellant, The Kansas City Southern Railway Company, Successor in Interest by Merger to MidSouth Corporation, MidLouisiana Rail Corporation, MidSouth Rail Corporation SouthRail Corporation and TennRail Corporation.
Vyrona M. Wiltz, Krotz Springs, for Defendant-Appellee, Louisiana Tax Commission.
Before WATKINS and FOIL, JJ., and TANNER,[1] J. Pro Tem.
WATKINS, Judge.
Plaintiff, Kansas City Southern (KCS), successor in interest by merger to MidSouth Rail Corporation (MidSouth), appeals from a district court judgment affirming the 1993 ad valorem property tax assessment to Mid-South by the Louisiana Tax Commission.

FACTS
On August 10, 1993, the Commission issued a notice of its initial determination of appraised and assessed valuation for 1993 ad valorem property tax assessment purposes which set forth a system value of $200,000,000[2] for MidSouth's public service properties. In accordance with LSA-R.S. 47:1856, MidSouth filed a protest to the initial determination with the Commission and on November 30, 1993, a hearing was held before the Commission at which MidSouth presented evidence to support its position that the system value was $125,000,000. The Commission issued a final determination of appraised and assessed value of MidSouth's public service properties at $200,000,000. The portion attributable to Louisiana was valued at $50,113,380, and the Louisiana assessed value was $6,699,950. MidSouth filed suit on January 27, 1994, seeking a reduction in the Commission's final determination of assessed valuation. On June 21, 1995, the trial court rendered judgment affirming the decision of the Commission. MidSouth appealed alleging the following errors:
1. The trial court erred in declining to hold that the Commission was in violation of constitutional and statutory provisions in using a different method to value MidSouth's *815 public service properties from that used for other railroads.
2. The trial court erred in declining to hold that the Commission's determination of the fair market value of MidSouth's public service properties violated the equal protection clause of the Fourteenth Amendment to the United States Constitution.
3. The trial court erred in declining to hold that the Commission violated constitutional and statutory provisions and was manifestly erroneous in its application of the income approach.
4. The trial court erred in declining to hold that the Commission was in violation of statutory provisions in using the acquisition price of MidSouth as the basis for determining market value.
5. The trial court erred in declining to hold that the Commission was in violation of constitutional provisions in including the value of cash and accounts receivable in MidSouth's unit valuation.
6. The trial court erred in declining to hold that the Commission was in violation of constitutional and statutory provisions in including the value of intangibles in MidSouth's unit valuation.

STANDARD OF REVIEW
Appeals of decisions of the Tax Commission are governed by LSA-R.S. 49:964(G) of the Administrative Procedure Act which provides that:
G. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
(6) Manifestly erroneous in view of the reliable, probative, and substantial evidence on the whole record....
We note that "the manifest error test of LSA-R.S. 49:964(G)(6) is used in reviewing the facts as found by the agency, as opposed to the arbitrariness test used in reviewing conclusions and exercises of agency discretion." Johnson v. Odom, 536 So.2d 541, 546 (La.App. 1st Cir.1988), writ denied, 537 So.2d 213 (La.1989).

ASSIGNMENT OF ERROR NUMBER 1
Appellant contends that the Commission violated the uniformity requirements of Article VII § 18 of the Louisiana Constitution of 1974 and LSA-R.S. 47:1853(B)(2) in determining the fair market value of Mid-South's public service property. According to appellant, the Commission's method of determining the fair market value of Mid-South's public service properties was different from the method used for the public service properties of Class I railroads, resulting in a higher tax burden to the appellant.
In its appraisal of interstate railroads, the Commission employs the unitary valuation method, whereby the fair market value of the entire system is first determined, then an allocation is made to each state of that portion of the system that is located within the taxing jurisdiction of that state. Thereafter, the allocated portion is given an assessed value which is a percentage of the property's fair market value. The Commission determines the fair market value of the system through the income, cost, and market appraisal methods in accordance with LSA-R.S. 47:1853. Under the market approach, also referred to as the "debt and equity approach," the Commission considers all outstanding securities attributable to the railroad's operating system as well as all obligations and liabilities. Under the cost approach, the Commission determines the book cost of the railroad and deducts accrued depreciation. The Commission does not consider physical, economic or functional obsolescence in this calculation because the Commission normally attributes no greater weight to this approach than 10%. Under the income approach, the Commission estimates *816 the present worth of the income the property will produce during the remainder of its productive life. To accomplish this calculation, the Commission takes an average of the last five years of net operating income and capitalizes it. In its system valuation of MidSouth, a Class II railroad,[3] the Commission used all three methods and weighted the cost approach at 10%, the income approach at 20% and the market approach at 70%. However, in determining the fair market value of Class I railroads in Louisiana, the Commission does not use the market approach, instead choosing to use only the income and cost approaches. A comparison of the fair market value of Mid-South's property to Class I railroads' property operating in Louisiana is reflected in the following chart:

 Railroad Indicators of Value Amount Weight Weighted Value
1. MidSouth Cost $ 223,286,000 10% $ 22,328,600
 Income 175,439,000 20% 35,087,800
 Stock & Debt 227,000,000 70% 158,900,000
 _______________
 Correlated Value $200,000,000 $ 216,316,400
 ____________
2. Kansas Cost $ 568,479,000 10% $ 56,847,900
 City Income 327,181,000 90% 294,462,900
 Southern Stock & Debt 452,573,000 0 0
 ______________
 Correlated Value $347,000,000 $ 351,310,800
 ____________
3. Southern Cost $4,136,823,000 10% $ 413,682,300
 Pacific Income 250,000,000 90% 225,000,000
 Stock & Debt 0 0 0
 ______________
 Correlated Value $640,000,000 $ 638,682,300
 ____________
4. Union Cost $8,803,267,000 5% 440,163,350
 Pacific Income 4,750,000,000 95% 4,512,500,000
 Stock & Debt 8,100,000,000 0 0
 ______________
 Correlated Value $4,900,000,000 $4,952,663,350
 ______________
5. CSX Cost $9,141,348,000 15% $1,371,202,200
 Income 2,222,222,000 85% 1,888,888,700
 Stock & Debt 5,583,000,000 0 0
 ______________
 Correlated Value $3,250,000,000 $3,260,090,900
 ______________
6. Santa Fe Cost $4,072,729,000 0 $ 0
 Income 1,229,167,000 100% 1,229,167,000
 Stock & Debt 0 0 0
 ______________
 Correlated Value $1,230,000,000 $1,229,167,000
 ______________
7. Norfolk Cost $8,129,582,000 5% $ 406,479,100
 Southern Income 4,400,000,000 95% 4,180,000,000
 Stock & Debt 9,622,695,460 0 0
 ______________
 Correlated Value $4,500,000,000 $4,586,479,100
 ______________
8. Illinois Cost $1,076,709,000 5% $ 53,835,450
 Central Income 602,410,000 95% 572,289,500
 Stock & Debt 1,438,825,000 0 0
 _______________
 Correlated Value $625,000,000 $ 626,124,950
 ____________

*817 Article VII § 18 of the Louisiana Constitution addresses two aspects of uniformity with regard to ad valorem property tax assessments. Sub-Section (A) of Article VII § 18 provides in part that "[t]he percentage of fair market value shall be uniform throughout the state upon the same class of property." Sub-Section (D) of Article VII § 18 provides in part that "[f]air market value ... of property shall be determined in accordance with criteria which shall be established by law and which shall apply uniformly throughout the state."
In accordance with the constitutional mandate of Article VII, the legislature enacted LSA-R.S. 47:1853, which provides in pertinent part as follows:
B. (1) In appraising public service properties, the Louisiana Tax Commission shall:
(a) Employ all of the following nationally recognized techniques of appraisal, where applicable, to best determine fair market value:
(i) The market approach.
(ii) The cost approach.
(iii) The income approach.
(b) Assign such weight to each approach as is appropriate to best determine fair market value.
(2) However, all public service properties of the same nature and kind shall be appraised in the same manner....
The Commission concedes that it did not employ the market approach in assessing any of the Class I railroads in Louisiana. However, the Commission contends that it acted within its discretion in so doing. Apparently, the Commission believes that the recent amendment to LSA-R.S. 47:1853(B)(1)(b), permitting the Commission to assign such weight to each approach as is appropriate to best determine fair market value, gives the Commission unfettered discretion to assign different weights to determine the fair market value of public service properties of the same nature and kind.[4] We disagree.
Although the 1992 amendment to LSA-R.S. 47:1853 permits the Commission discretion in determining the weight it will give to the various approaches to determining fair market value, this discretion is tempered by the co-existing provision in LSA-R.S. 47:1853(B)(2) stating that "all public service properties of the same nature and kind shall be appraised in the same manner."
The Commission further argues that neither the United States Constitution nor the Louisiana Constitution prohibits the creation of classifications relating to taxation, as long as the classifications are based upon reasonable distinctions. The Commission notes that LSA-R.S. 47:1853(B)(2) requires only that public service properties "of the same nature and kind" be appraised in the same manner and that MidSouth, a Class II railroad, and Class I railroads are not properties of the same nature and kind. The Commission contends that its decision to classify MidSouth's property differently from the property of Class I railroads was reasonable for two reasons; "First unlike any of the Class I railroads appraised by the Commission, MidSouth had recently been sold in an arm's-length transaction. Second, because the ICC does not require Class II railroads to use uniform accounting methods, it is completely logical for the Commission to place less reliance on the income method when assessing Class II railroads."
When classifications are discriminatory and violative of the principles of "equal protection," the function of the courts is to determine whether the distinction is arbitrary or is based on practical and reasonable grounds with relation to the public purpose sought to be achieved. See Louisiana & Arkansas Railway Company v. Goslin, 258 La. 530, 246 So.2d 852 (1971), cert. den., 420 U.S. 963, 95 S.Ct. 1356, 43 L.Ed.2d 441 (1975).
Herein, we find that the distinction made by the Commission between Class I and Class II railroads is not based upon reasonable grounds, and we are unable to glean from the record any explanation or justification why such a distinction is necessary and what state purpose, if any, that it serves. *818 Accordingly, we find that the methods used by the Commission to determine the fair market value of MidSouth's property violate the uniformity requirements of Article VII § 18 of the Louisiana Constitution and the provisions of LSA-R.S. 47:1853.

ASSIGNMENT OF ERROR NUMBER 2
KCS contends that the Commission's determination of fair market value of Mid-South's public service properties for the 1993 assessment year violates the equal protection clause of the Fourteenth Amendment of the United States Constitution. KCS argues that since 1988 MidSouth has had the highest ad valorem tax burden, based on assessed value per track mile, than any other railroad operating in Louisiana from 1988 through 1993. Specifically, in 1988, 1991, 1992, and 1993, MidSouth's assessments per track mile were $19,756, $17,882, $20,046, and $21,054 respectively, while the mean for other railroads was $10,321, $12,136, $13,339, and $15,195 respectively.[5]
We addressed this same argument in a previous appeal by MidSouth and MidLouisiana Rail Corporation challenging their respective tax assessments for 1988. In Mid-Louisiana Rail Corp. v. Tax Commission, 588 So.2d 1163, 1168 (La.App. 1st Cir.1991), writ denied, 594 So.2d 895 (La.1992), we acknowledged that:
Denial of uniformity in the form of under-assessment of other taxpayers is indeed a denial of equal protection and due process. In Re Protest of Dow Chemical Co., 458 So.2d 955 (La.App. 1st Cir.1984). To establish an unconstitutional denial of uniformity in the form of under-assessment of other taxpayers, a taxpayer must allege and prove a pattern of under-assessment. Furthermore, the denial of uniformity must have been intentional, although intent may be inferred from a systematic lack of uniformity. Id.
The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution protects the rights of equality and uniformity of taxation, and its cloak is substantially similar to the protection of rights afforded by the uniformity provisions of the Louisiana State Constitution....
According to KCS, MidSouth has been denied equal protection of the law because the fair market value of its public service property is determined by using the recent purchase price of its property, while the Class I railroads are valued primarily upon their income. We recognized this type of "welcome stranger assessment" in Mid-Louisiana, and explained that this type of assessment is violative of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution when there is a failure by the taxing authority to equalize the differences within a short period of time. See Allegheny Pittsburgh Coal Co. v. County Com'n of Webster County, W.Va., 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989). "In each case, the constitutional requirement is the seasonable attainment of a rough equality in tax treatment of similarly situated property owners." Allegheny, 488 U.S. 336, 343, 109 S.Ct. 633, 638, 102 L.Ed.2d 688 (1989).
In MidLouisiana, we agreed with the Commission that its failure to attain a rough equality among the railroads within one year is not violative of the Equal Protection Clause. However, we stated that the assessments of the following year "should begin to reflect substantial progress toward the achievement of equality of treatment." Mid-Louisiana, 588 So.2d at 1169. We also recognized that the task of reappraising all the railroads in Louisiana, to reflect the recent purchases of MidSouth and MidLouisiana, would not be a simple undertaking. However, we made it clear that if the Commission wished to continue assessing MidSouth and MidLouisiana Rail based upon their current market value, the Commission's assessments of other railroads would have to reflect current market value as well. Id. Apparently, *819 no progress has been made toward attainment of this goal since 1988.
In the instant case the Commission has not only used the recent stock purchase of Mid-South in determining its fair market value, but it added insult to injury by weighting the market value at 70% while giving no weight to the market value of the Class I railroads operating in Louisiana. The disparity in the methods used to determine fair market value becomes more egregious upon examination of the respective values of the Class I railroads (see Chart above). The majority of Class I railroads have income values which are a fraction of the cost valuation. This fact, combined with the 85 to 100% weight given to the income value by the Commission, makes the methodology of the Commission highly suspect with regard to its valuation of Mid-South.
Based on the evidence before us, we find that the Commission's 1993 tax assessment of MidSouth violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution.

ASSIGNMENT OF ERROR NUMBER 3
In this assignment of error KCS contends that MidSouth was "grossly overvalued," as compared to other railroads, under the income approach used by the Commission, because the Commission:
1) Failed to take into account the condition of MidSouth's track structures and equipment and did not adjust MidSouth's net income for ICC accounting standards; and
2) Used an improper capitalization rate.

(a) income reduction for business expenses
KCS contends that not only must the appraisal methods be uniform among the railroads, but the calculations to arrive at the components to the appraisal methods must be uniform. KCS points out that Class I railroads are the only ones required to follow the accounting rules mandated by the Interstate Commerce Commission and under those mandated rules, the railroads are required to deduct as expenditures from income certain track and maintenance expenses.[6] MidSouth, a Class II railroad, chose to capitalize certain expenses that Class I railroads are required to expense. Now MidSouth seeks to claim a portion of these capitalized assets as expenditures from income.
It is true that in the assessment of public utility property, according to the income method of valuation, a company is ordinarily entitled to deduct from its annual earnings the cost of replacements or renewals of its tangible property used in the business. See Baton Rouge Electric Co. v. Board of State Affairs, 149 La. 383, 89 So. 244 (La.1921). Herein, the Commission based its income approach to value on the information submitted by MidSouth. According to that information MidSouth capitalized all expenses for repairs to the track.
LSA-R.S. 47:1853(A) provides that the "Louisiana Tax Commission shall, on or before September first of each calendar year, appraise, for taxation, public service properties based upon each company's report, as defined in Section 1852(A) and such other information as may be available to the Louisiana Tax Commission." [Emphasis supplied.]
Based on the record before us we cannot say that the Commission abused its discretion in refusing to change its original assessment to reflect a different accounting scheme proposed by MidSouth. Because the annual tax assessment was made upon information supplied to the Commission by MidSouth in accordance with LSA-R.S. 47:1853(A), and KCS has offered no compelling proof[7] of why the new accounting scheme should be recognized *820 by the Commission, we cannot say that the Commission abused its discretion in basing its assessment upon the information originally supplied by MidSouth. Cf. Broussard v. Louisiana Tax Commission, 614 So.2d 1341 (La.App. 3rd Cir.1993).

(b) deferred maintenance
KCS also contends that the trial court erred in failing to require the Commission to adjust MidSouth's income to reflect deferred maintenance of track. According to KCS, in order to upgrade MidSouth's system to FRA[8] Class III rails maintained by Class I railroads, MidSouth would have had to replace 650,000 ties over the period from 1988 though 1992 at a cost of $26,000,000. KCS contends that its income should be reduced by the amount of maintenance it deferred.
We are unable to tell from the record before us when MidSouth informed the Commission of its wish to change its report to reflect deferred maintenance for five years. Furthermore, the evidence before the Commission revealed that the Form 1OK submitted to the Securities and Exchange Commission by MidSouth in 1992, stated that "... in the opinion of management, all maintenance required to maintain the track and related assets, of MidSouth, [is] in good operating condition and no required maintenance has been deferred." Based on the evidence, we find no abuse of discretion in the Commission's decision not to adjust MidSouth's income to reflect deferred maintenance.

(c) capitalization rate
Finally, with regard to the income approach used to determine the fair market value of MidSouth, KCS contends that the Commission erred in applying an 11.4% capitalization rate. Essentially, KCS contends that the Commission's practice of using uniform capitalization rates is inequitable because it does not reflect true value.
The determination of capitalization rates by the Commission is accomplished by using industry standard rates. Equity is capitalized at 13.5%, and debt is capitalized at 10%. The Commission then weights these figures based upon a company's debt to equity ratio. In the case of MidSouth the rate was computed as follows:

 Capitalization Weighted
 Percent Rate Rate
Equity 40% 13.5 5.4%
Debt 60% 10.0 6.0%
 ________
 11.4%

Although the capitalization rates are the same for debt and equity this approach will vary the capitalization rate for each company based upon its debt and equity structure.
According to the testimony of Dr. John A. Scrowcroft, KCS's financial expert, a capitalization rate reflects the cost of capital, or, in other words, the return required by an investor when investing in a project or security. The Commission's capitalization rate of 11.4% reflects that MidSouth, as compared to all Class I railroads, except CSX, (see chart above) is the least risky business enterprise. Dr. Scrowcroft believed that the correct capitalization rate for determining MidSouth's value would be 16%.
According to the testimony of Mr. Glenn O. Thompson, the chief appraiser for the Commission, standard capitalization rates are used primarily because of time constraints. The record reflects that after applying the Commission's standard debt and equity rates the final capitalization rates for all the railroads operating in Louisiana fell between 10.8 percent and 12 percent. Mr. Thompson explained that the Commission does not have time to determine the creditworthiness of bonds that may have been issued by an appraised entity. However, he indicated that the appraisers would consider any information that a company would provide the Commission and that the Commission often negotiates the capitalization rate.
*821 Although we are not entirely convinced that the capitalization rate used by the Commission is reflective of the true value of MidSouth, we cannot say that the Commission abused its discretion in applying the 11.4% capitalization rate.

ASSIGNMENT OF ERROR NO. 4
Because of our disposition of assignments of error number one and two we pretermitt any discussion of the merits of this assignment of error.

ASSIGNMENT OF ERROR NO. 5
In this assignment of error, KCS contends that the Commission's method of valuation violates the provisions of Article VII § 21 of the Louisiana Constitution because the method includes the value of property which is specifically excluded from ad valorem taxation. Article VII § 21 provides in pertinent part:
Section 21. In addition to the homestead exemption provided for in Section 20 of this Article, the following property and no other shall be exempt from ad valorem taxation:
(C)(1) cash on hand or deposit; ...
(7) debts due for merchandise or other articles of commerce or for services rendered;
KCS argues that the unit method of valuation necessarily includes intangible assets specifically exempted from ad valorem taxation by Article VII § 21.[9] However, the Commission contends that KCS failed to prove that any exempt property was included in MidSouth's public service property assessment. We disagree with the Commission.
Mr. Glenn Thompson testified that the valuation of the entire operating enterprise includes the going concern or business enterprise value. Furthermore, Dr. Scrowcroft, KCS's expert financial analyst, testified as follows regarding the valuation of cash and accounts receivable:
Q. Dr. Scrowcroft, does your and the Commission's value of MidSouth and its subsidiaries include the value of cash on hand and accounts receivable and if so, huh, in what amount?
A. Yes, it does. Under the income approach it includes an amount of approximately 7.8 million dollars.
Q. And if you were using the market approach to value that was employed by the Commission, what would the amount of cash in accounts receivable of MidSouth be.
A. Closer to Twenty-Three Million Dollars ($23,000,000.00).
Q. Does your and the Commission's valuation of MidSouth and it's subsidiaries include the value of all intangible property.
A. Yes.
Based upon the evidence presented, we conclude that the Commission abused its discretion in failing to exclude the items of property exempt under Article VII § 21 of the Louisiana Constitution.

ASSIGNMENT OF ERROR NO. 6
In its final assignment of error, KCS questions the inclusion of intangible property (other than cash and accounts receivable) in determining MidSouth's fair market value. KCS argues that because a tax on similar property is not imposed on other commercial and industrial taxpayers in Louisiana, the Commission's assessment violates the uniformity provisions of Article VII, § 18 of the Louisiana Constitution and the Railroad Revitalization and Regulatory Reform Act of 1976 (4-R Act).
As noted above, the Louisiana Constitution specifically excludes cash and debts due for merchandise or other articles of commerce or for services rendered from ad valorem taxation. *822 However, recently enacted LSA-R.S. 47:1709 grants an additional exemption for all intangible property except in the case of "public service properties, bank stocks, and credit assessments on premiums written in Louisiana by insurance companies and loan and finance companies."
The provisions of LSA-R.S. 47:1709 are as follows:
§ 1709. Exemption for intangible and incorporeal property
Notwithstanding any provision to the contrary in this Subtitle, all intangible and incorporeal property of any kind or nature whatsoever, except public service properties, bank stocks, and credit assessments on premiums written in Louisiana by insurance companies and loan and finance companies, shall not be placed on the assessment lists or rolls by any assessor in any parish or district and shall be exempt from all ad valorem taxation.
Initially, KCS contends that the disparate treatment of taxpayers with regard to valuing intangible property is a violation of the uniformity provisions of the Louisiana Constitution, stating that "taxing the intangibles of one taxpayer while not taxing the same to another is a clear violation of this constitutional mandate." Additionally, KCS contends that the Commission's determination of MidSouth's fair market value unlawfully discriminates against MidSouth as compared to other commercial and industrial property, in violation of the 4-R Act which sets forth a congressional declaration that state tax systems which discriminate against common carriers by railroad constitute an illegal burden on interstate commerce.
When reviewing the constitutionality of a statute the court is guided by well established principles. "A general principle of judicial interpretation of a state constitution is that, unlike the federal constitution, a state charter's provisions are not grants of power but instead are limitations on the otherwise plenary power of the people of a state exercised through its legislature." Hainkel v. Henry, 313 So.2d 577, 579 (La. 1975).
A corollary to this principle is that statutes are presumed constitutional, and any doubt is to be resolved in the statute's favor. State in Interest of J.A.V., 558 So.2d 214, 216 (La.1990). Thus, when a constitutional challenge is made, the question is not whether the constitution empowers, but rather whether the constitution limits the legislature, either expressly or impliedly, from enacting the statute at issue. Chamberlain v. State Through DOTD, 624 So.2d 874, 879 (La.1993).
In the instant case the pivotal question is whether Article VII § 21 of the Louisiana Constitution prohibits the legislature from granting the tax exemption provided for in LSA-R.S. 47:1709. Article VII § 21 prescribes the classes and types of property exempt from taxation in Louisiana. These exemptions are listed in separately numbered paragraphs preceded by the following language, "[I]n addition to the homestead exemption provided for in Section 20 of this Article, the following property and no other shall be exempt from ad valorem taxation:" [Emphasis supplied.]
The language of Article VII § 21 sets forth a mandatory prohibition against exemptions of any property other than that specifically enumerated and is thus, a self-executing constitutional provision. "[P]rohibitory or negative constitutional provisions are self-executing as no supplementary legislation is needed to give them effect." Chamberlain, 624 So.2d at 882, citing Cooley, 1 Treatise on Constitutional Limitations, 167 n. 1 (8th Ed.1927). Given the mandatory prohibition set forth in Article VII § 21 the legislature is prohibited from granting any exemptions from ad valorem taxation different from the exclusive exemptions granted in the Constitution. See In Re Pitre, 93-2322 (La. 1/14/94); 630 So.2d 700 (La.1994).
Attempts to circumvent similar provisions of Article X § 24 of the 1921 Constitution have been repeatedly struck down by the courts of this state. See Warren County, Mississippi v. Hester, 219 La. 763, 54 So.2d 12, 14 (1951), cert denied, 342 U.S. 877, 72 S.Ct. 167, 96 L.Ed. 659 (1951); ("it is ordained that our legislature is powerless to create tax exemptions or enlarge the scope of *823 those provided by the Constitution."); Hibernia National Bank in New Orleans v. Louisiana Tax Commission, 195 La. 43, 196 So. 15, 19 (1940), ("No principle of law is better settled in this State than that the Legislature is powerless, directly or indirectly, to grant exemptions from taxation.").
Accordingly, we conclude that LSA-R.S. 47:1709 conflicts with LSA-Const. Art. VII, § 21 and is thus invalid. Having so held, we pretermit discussion of the merits of appellant's additional arguments with regard to the constitutionality and validity of LSA:R.S. 47:1709.
For the above reasons we reverse, in part, the decision of the Tax Commission, as affirmed by the district court. We remand to the Tax Commission for reassessment of MidSouth's 1993 ad valorem tax assessment, in accordance with the views expressed herein. Costs of this appeal in the amount of $521.66 are assessed to the Tax Commission.
REVERSED IN PART, AND REMANDED.
NOTES
[1] Judge Thomas W. Tanner, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The appraised value as originally determined by the Commission was $216,316,400; however, through negotiations with MidSouth, the Commission agreed to lower it to $200,000,000.
[3] The Interstate Commerce Commission classifies railroads based on gross operating revenues. Class I railroads have operating revenues of $250,000,000 or more, Class II railroads have gross operating revenues between $20,000,000 and $250,000,000, and Class III railroads have gross operating revenues of $20,000,000 or less.
[4] The amendment to LSA-R.S. 47:1853 adding section (B)(1)(b) was apparently in response to our previous decision in MidLouisiana Rail Corp. v. Tax Com'n, 588 So.2d 1163 (La.App. 1st Cir. 1991), writ denied, 594 So.2d 895 (La.1992), wherein we held that the provisions of § 1853 required an equal weighting of the income, cost and market approaches.
[5] We note that although MidSouth was being assessed at a higher rate than other railroads, the undisputed evidence presented at the administrative hearing revealed that MidSouth's system was in poor shape with 16% of its line being subject to slow orders because the track was not up to federal standards.
[6] According to the testimony of Mr. Brown, senior vice president of finance and accounting for KCS, ICC accounting regulations require all Class I railroads to expense: (1) all cross ties installed in quantities of less than 100; (2) all rail in sections less than a quarter of a mile; (3) all ballast in quantities of less than five cars at one location.
[7] The record is unclear at what time MidSouth informed the Commission that it wished to expense some of these repairs in accordance with ICC guidelines. The record also fails to explain why MidSouth did not expense these repairs and improvements in its initial report.
[8] Federal Railroad Act.
[9] We further note the following persuasive authorities cited by KCS. Burlington Northern Railroad Company v. Bair, 815 F.Supp. 1223 (S.D.Iowa 1993), aff'd, 60 F.3d 410 (8th Cir. 1995), cert. denied, ___ U.S. ___, 116 S.Ct. 914, 133 L.Ed.2d 844 (1996), [when a railroad is valued as a unit on a business enterprise or going concern basis, that valuation necessarily includes intangible assets]; ITT World Communications, Inc., v. City and County of San Francisco, 37 Cal.3d 859, 210 Cal.Rptr. 226, 693 P.2d 811 (1985) [unit taxation is properly characterized not as the taxation of real property or personal property or even a combination of both, but rather as the taxation of property as a going concern.]