[S.F. No. 24721. Jan. 31, 1985.]

ITT WORLD COMMUNICATIONS, INC., Plaintiff and Appellant, v.
CITY AND COUNTY OF SAN FRANCISCO et al.,
Defendants and Respondents.

860

COUNSEL

Robert L. Dunn and Bancroft, Avery & McAlister for Plaintiff and Appellant.

George P. Agnost, City Attorney, John J. Doherty, Deputy City Attorney, John K. Van de Kamp, Attorney General, Edward P. Hollingshead, Gary A. Larson and Robert D. Milam, Deputy Attorneys General, for Defendants and Respondents.

Jerome B. Falk, Jr., Steven L. Mayer, Dirk M. Schenkkan and Howard, Rice, Nemerovski, Canady, Robertson & Falk as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**MOSK, J.**—The question in this case is whether the "valuation rollback" provision of article XIII A, section 2, subdivision (a), of the California Constitution, part of the 1978 initiative known as Proposition 13, applies to unit taxation of public utility property.[1] Plaintiff ITT World Communications, Inc. (hereinafter Worldcom) brought this action for a property tax refund for the fiscal years 1978-1979 and 1979-1980 against defendants, the City and County of San Francisco and the State Board of Equalization (hereinafter the Board), alleging that the Board acted illegally in refusing to adjust the assessment of Worldcom's property to its 1975-1976 value in accordance with the valuation rollback provision. The court entered summary judgment in favor of defendants, and plaintiff appealed. We conclude that the judgment should be affirmed.

### I

In 1935 the current system of ad valorem unit taxation of public utility property, now defined by article XIII, section 19, of the California Constitution and Revenue and Taxation Code section 721 et seq., came into effect.[2] Under this system all property, other than franchises, owned or used by public utilities is annually assessed and subjected to taxation. (Cal. Const., art. XIII, § 19; §§ 721-722, 755-756.) Under the system that had prevailed from 1910 into the 1930's, there was a separation of sources of tax revenue: public utility property was subject to a special gross receipts "in lieu" tax levied and collected by the state to support state government, and other property was subject to the regular ad valorem property tax levied and collected by local government to support itself. (Bertane, *The Assessment of Public Utility Property in California* (1973) 20 UCLA L.Rev. 419, 423-424 (hereinafter Bertane, *Public Utility Property*).)

By the early 1930's, however, the Great Depression had brought about a crisis in taxation as in other aspects of public and private life, and there

---

[1]This question was previously presented but not reached in *Pacific Gas & Electric Co.* v. *State Bd. of Equalization* (1980) 27 Cal.3d 277 [165 Cal.Rptr. 122, 611 P.2d 463], in which we held that the public utility's action for mandate and declaratory relief was barred by article XIII, section 32, of the Constitution.

[2]All statutory references are to the Revenue and Taxation Code.

arose general dissatisfaction with this system of taxation. Local tax rates were believed to be too high, in part because public utility property was not on the local tax rolls; state revenues were believed to be too low, in part because public utility tax rolls could be raised only by a two-thirds vote of the Legislature (Cal. Const., former art. XIII, § 14, subd. (f)) and the public utilities possessed sufficient political power to block such tax increases (see Rep. of State Bd. of Equalization for 1931-1932 (1932) p. 12). In the face of this crisis, the Legislature drafted and the voters adopted an amendment to the Constitution known as the Riley-Stewart Plan, which completely revised this system of taxation. The special gross receipts "in lieu" tax was repealed and public utility property was subjected to the regular ad valorem property tax, thus restoring public utility values to the local tax rolls and alleviating the local tax burden; the political problems inherent in taxing public utilities at the state level pursuant to legislatively set rates were eliminated by having public utility property centrally assessed by the Board.

One of the primary objectives of the system of unit taxation of public utility property is to ascertain and reach with the taxing power the entire real value of such property. (See Plan for Tax Relief presented in Sen. Const. Amend. No. 30 and Assem. Const. Amend. No. 68 to be Submitted as Prop. 1 on Ballot of June 27, 1933, p. 8 (hereinafter Plan for Tax Relief); Bertane, *Public Utility Property, supra,* 20 UCLA L.Rev. at pp. 426-427, 433.) It has long been recognized that "public utility property cannot be regarded as merely land, buildings, and other assets. Rather, its value depends on the interrelation and operation of the entire utility as a unit. Many of the separate assets would be practically valueless without the rest of the system. Ten miles of telephone wire or one specially designed turbine would have a questionable value, other than as scrap, without the benefit of the rest of the system as a whole." (Bertane, *Public Utility Property, supra,* at p. 433.) Unit taxation prevents real but intangible value from escaping assessment and taxation by treating public utility property as a whole, undifferentiated into separate assets (land, buildings, vehicles, etc.) or even separate kinds of assets (realty or personalty).

The unit taxation of public utility property is effected in four general stages. First, the Board annually assesses all unitary property of each public utility, that is, all property that it uses in performing its function. (§ 723.) In making this assessment, the Board uses the principle of unit valuation: it determines the value of the property as a whole, rather than the value of any of the assets as parts of the whole; it does not assess each asset and then total up the valuation, but values the property as a unit, primarily

through a capitalized earnings approach.[3] Second, the owner of the public utility property is offered an opportunity to apply for corrections. (§§ 731, 741-749.) Third, the Board transmits to the local taxing authority a roll showing the assessments against public utility property situated within its jurisdiction. (§§ 755-756, 758.) In accordance with the principle of unit valuation, such assessments do not represent the value of the assets situated within that jurisdiction; rather, they represent the share of the value of the property as a whole that the Board has determined should equitably be allocated to the jurisdiction. Thus, after it has assessed the value of the property as a whole, the Board makes a formulary allocation that has little or no relationship to the actual fair market value of the particular assets situated within the jurisdiction. Fourth, the local taxing authority subjects the property so assessed to taxation at the rate fixed in its jurisdiction. (See §§ 755-756.)

## II

Article XIII A provides in part that "[t]he maximum amount of any ad valorem tax on real property shall not exceed One percent (1%) of the full cash value of such property." (Cal. Const., art. XIII A, § 1, subd. (a).) The valuation rollback provision here challenged provides in relevant part that "[t]he full cash value means the county assessor's valuation of real property as shown on the 1975-76 tax bill under 'full cash value' . . . ." (*Id.*, § 2, subd. (a).)

In contending that the maximum assessed value of its unitary property in California should not exceed that property's 1975-1976 value, plaintiff first argues that article XIII A applies directly to the unit taxation of public utility property. The argument is without merit.

## A

From our review of the relevant constitutional and statutory provisions, we conclude that unit taxation is properly characterized not as the taxation of real property or personal property or even a combination of both, but rather as the taxation of property *as a going concern*. First, what the Board assesses is the value of the public utility property as a going concern; it

---

[3]In using a capitalized earnings approach, the Board (1) calculates the net operating income of the taxpayer; (2) determines an appropriate capitalization rate, which is the equivalent of a reasonable rate of return; and (3) divides net operating income by the capitalization rate to determine unitary value. The Board uses such an approach to determine the unitary value of public utility property because market data are practically nonexistent: public utilities are rarely bought and sold.

considers the earnings of the property as a whole, and does not consider, less still assess, the value of any single real or personal asset. Second, what the Board allocates to the local taxing authority is, again, a share of the value of the public utility property as a going concern; it makes a formulary allocation based on considerations of equity, and does not even attempt to match the allocation to the fair market value of the particular assets of the utility situated within the jurisdiction.

As we have explained, "[b]y its terms, article XIII A applies only to real property taxes. In *Amador* [*Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208 (149 Cal.Rptr. 239, 583 P.2d 1281)] we upheld the constitutionality of the enactment and accorded it the liberal construction to which initiative measures are entitled. [Citation.] In so doing, throughout our opinion and in varying contexts we observed that the measure pertained to the subject of *real property* taxation and declared its underlying purpose and chief aim to be *real property* tax relief." (*Board of Supervisors* v. *Lonergan* (1980) 27 Cal.3d 855, 863 [167 Cal.Rptr. 820, 616 P.2d 802]; italics in original.) In the same case we also emphasized that "Proposition 13 was widely publicized as a taxpayers' revolt providing tax relief for *homeowners,*" and was widely accepted as such by the voters. (*Id.* at p. 864 & fn. 9; italics added.)

In determining whether article XIII A directly applies to the unit taxation of public utility property, we use well settled rules of construction. ▪ First, "[a] constitutional amendment should be construed in accordance with the natural and ordinary meaning of its words." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 245 [149 Cal.Rptr. 239, 583 P.2d 1281]; accord, *In re Quinn* (1973) 35 Cal.App.3d 473, 482 [110 Cal.Rptr. 881].) Second, it should not be construed in such a way as to undermine its validity. (See *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* at p. 245; *Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 598 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].) Third, it should not be construed to effect the implied repeal of another constitutional provision. (*Board of Supervisors* v. *Lonergan, supra,* 27 Cal.3d 855, 868-869.)

▪ Using these rules, we conclude that article XIII A does not directly apply to unit taxation. First, the provision is limited by the ordinary and natural meaning of its words to the subject of real property taxation. Unit taxation, by contrast, is simply not real property taxation either in substance or in form. Second, the provision deals with the subject of real property taxation; if it were construed to relate to the subject of unit taxation as well,

it might arguably contravene the single-subject requirement of article II, section 8, subdivision (d). Third, the provision requires assessment to be based on 1975-1976 value (or the value at the date of acquisition if the property is acquired after 1975-1976). Article XIII, section 19, however, authorizes the unit taxation of public utility property and, as an essential aspect thereof, *annual* assessment based on the current value of the property as a going concern. (See *Southern Cal. Tel. Co.* v. *Los Angeles* (1941) 45 Cal.App.2d 111, 123-125 [113 P.2d 773]; Bertane, *Public Utility Property, supra,* 20 UCLA L.Rev. at p. 433.) If article XIII A were construed to require the assessment of public utility property to be based on its 1975-1976 value, it would *pro tanto* impliedly repeal article XIII, section 19.

■ Yet "[s]o strong is the presumption against implied repeals that when a new enactment conflicts with an existing provision, 'In order for the second law to repeal or supersede the first, the former must constitute a revision of the entire subject, so that the court may say that it was intended to be a substitute for the first.'" (*Board of Supervisors* v. *Lonergan, supra,* 27 Cal.3d 855, 868.) ■ Because article XIII A does not constitute a revision of the entire subject of taxation, but merely amends the Constitution on certain aspects of the subject of real property taxation, we cannot construe it to accomplish an implied repeal of article XIII, section 19.

### B

■ In addition, article XIII A applies only to *locally* assessed property and not to public utility property, which is state-assessed.

Starting as we must in every case of constitutional construction with the language of the provision (*Los Angeles County Transportation Com.* v. *Richmond* (1982) 31 Cal.3d 197, 205 [182 Cal.Rptr. 324, 643 P.2d 941]; see *People* v. *Anderson* (1972) 6 Cal.3d 628, 637-639 [100 Cal.Rptr. 152, 493 P.2d 880]), we observe that the valuation rollback provision is limited by its terms to locally assessed real property. The provision defines "full cash value" for purposes of the valuation rollback as "the *county assessor's valuation* of real property as shown on the 1975-76 tax bill under 'full cash value'" (italics added). (Cal. Const., art. XIII A, § 2, subd. (a).) There is, of course, no "county assessor's valuation" of state-assessed property. Thus, by its terms, the provision appears inapplicable to such property.

Plaintiff contends this apparently "plain meaning" of the valuation rollback provision is not its real meaning. Neither of its supporting arguments is persuasive.

Plaintiff first asserts that the purpose of the quoted language is simply to direct the real property owner to the figure on his 1975-1976 tax bill that

defines his value base, and not to exclude state-assessed property from the coverage of article XIII A. Under a long-established rule of construction, however, we must give significance to every word in the constitutional text. (*Hyatt* v. *Allen* (1880) 54 Cal. 353, 357; see *State Board of Education* v. *Levit* (1959) 52 Cal.2d 441, 462 [343 P.2d 8].) Plaintiff's reading of the provision violates this rule: the words, "county assessor's," are denied any significance at all and become superfluous. Even without those words, the real property owner would be directed to the figure on his 1975-1976 tax bill that defines his value base: "The full cash value means the . . . valuation of real property as shown on the 1975-76 tax bill under 'full cash value' . . . ." Ironically, if plaintiff were correct in construing the phrase merely to direct the real property owner to the value base of his property, it would clearly follow that state-assessed property is excluded from the valuation rollback provision. The law in effect when Proposition 13 was adopted required that a taxpayer receive, on either his tax bill or a separate statement, notice of the "full value . . . of locally-assessed property." (Former § 2611.5.) It did not require such a notice for state-assessed property—and does not require one now—and no such notice was given. Thus only the owner of locally assessed real property would be directed to the value base of his property; the owner of public utility property would not.

Plaintiff next argues by a *reductio ad absurdum* as follows: if the phrase is construed to define the coverage of the valuation rollback provision, it should be construed literally to include only real property that has been finally valued by a *county assessor*; but if it is so construed, it would exclude real property locally assessed by a county board of equalization or assessment appeals board, by a city assessor, or by the Board itself through a countywide adjustment—an absurd result. But we are not required to read literally the phrase in dispute, or any other word in a constitutional provision. (See *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 245.) ▮ Indeed, we may disregard "[t]he literal language of enactments . . . to avoid absurd results and to fulfill the apparent intent of the framers." (*Ibid.*)

▮ If we construe the phrase in accordance with this rule, we are led to no absurd results. First, the amount of real property locally assessed by an agency other than the county assessor is apparently minimal. Second, at the time Proposition 13 was adopted, all locally assessed real property that was not finally valued by a county assessor was initially assessed by such an assessor. (See former § 1601 et seq. (county board of equalization or assessment appeals board); Rep. of State Bd. of Equalization for 1976-1977 (1977) p. A-14, note b (city assessor); Cal. Const., art. XIII, § 18, and former § 1815 et seq. (countywide adjustment by the Board).) For purposes

of interpreting the 1975-1976 tax bill and finding the value base for locally assessed real property, the valuations by these agencies are the functional equivalents of the initial "county assessor's valuation." Thus, real property locally assessed by an agency other than the county assessor is within the coverage of the valuation rollback provision, and the absurd result that plaintiff asserts we would reach by construing the phrase in accordance with its plain meaning does not follow.[4]

Although the language of the valuation rollback provision seems clearly to exclude state-assessed property from its coverage, out of an excess of caution we shall refrain from concluding that it does so unambiguously in order that we may test our construction against such extrinsic aids as the ballot materials on Proposition 13 and the contemporaneous construction of the provision by the Legislature and by the Board, which is the administrative agency responsible for implementing it. We resort to such extrinsic aids, of course, only when language is ambiguous. (*Board of Supervisors* v. *Lonergan, supra,* 27 Cal.3d 855, 866; *Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 198 [137 Cal.Rptr. 460, 561 P.2d 1148].)

The ballot summary, arguments, and analysis are of limited assistance. Read as a whole, these materials present Proposition 13 as a measure concerned with real property tax relief for homeowners. They do not clearly address the issue of whether the valuation rollback provision would apply to state-assessed property; at best they merely suggest that it would not. For example, in the course of his analysis of section 1, subdivision (a), the Legislative Analyst stated: "This measure does not mention county assessed personal property (such as business inventories), or state assessed property (such as public utilities), but the Legislative Counsel advises us that the 1 percent limit would apply to *all* types of taxable property." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Prim. Elec. (June 6, 1978), analysis of Prop. 13 by Legislative Analyst, p. 56.)[5] When

---

[4] In any event, the problems of real property assessed by a city assessor or by the Board through a countywide adjustment are things of the past. First, under article XIII A, section 1, counties now levy real property taxes and then apportion them to lesser units within the jurisdiction; thus cities no longer levy a property tax to which the 1 percent limitation of section 1 and the definition of full cash value in section 2 are applicable. Second, under article XIII A the advent of a local roll based on 1975-1976 (or acquisition) value has rendered intercounty equalization impractical, if not impossible; accordingly, the Board has ceased doing intercounty equalization (see Prop. 13 Assessment Issues, A Briefing Book, by Assem. Rev. & Tax. Com. (Sept. 1980) p. D-7), and the statutes authorizing it (former § 1815 et seq.) have been repealed (Stats. 1982, ch. 327, § 145, p. 1480).

[5] The Legislative Counsel evidently based his advice on the opinion that the 1 percent limit would apply to personal property through the operation of article XIII, section 2 ("the tax per dollar of full value shall not be higher on personal property than on real property in the same taxing jurisdiction") and to state-assessed property through the operation of article XIII, section 19 (state-assessed property "shall be subject to taxation to the same extent and in the same manner as other property").

analyzing the effect of the valuation rollback provision, however, the Legislative Analyst made no such reference to state-assessed property. The omission is significant: because he did say that the one percent limit would apply to state-assessed property, his failure to say that the valuation rollback provision would also apply suggests that he believed that it would not.

More helpful than the ballot materials are the contemporaneous interpretations of the valuation rollback provision by the Legislature and the Board. Soon after the passage of Proposition 13, the Board promulgated regulations interpreting article XIII A and the Legislature began to enact legislation implementing it. Such "legislative and administrative implementations are traditionally accorded great weight by the courts in construing enactments such as article XIII A." (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d 208, 246.)

In June 1978 the Board adopted regulations (former Cal. Admin. Code, tit. 18, § 460 et seq.) which, among other things, interpreted the applicability of the valuation rollback provision to certain kinds of specially assessed property. The Board concluded that whereas the provision applied to nonprofit golf courses (*id.* § 465), enforceably restricted timberland (*id.* § 471), and open space land and historical property (*id.* § 470), it did not apply to state-assessed property (*id.* § 460, subd. (a)).

In the following session the Legislature in turn addressed the question of the applicability of the provision. (Stats. 1979, ch. 242, § 4, p. 506.) It overturned the Board's interpretation that the provision applied to nonprofit golf courses, enforceably restricted timberland, and open space land and historical property, but let stand the interpretation that it did not apply to state-assessed property. It is clear that the Legislature acted with knowledge of the regulations. (See 1 Implementation of Prop. 13, Property Tax Assessment, by Assem. Rev. & Tax Com. (Oct. 1979) p. 6.) Accordingly, we must infer that the Legislature adopted the Board's interpretation that the valuation rollback provision did not apply to state-assessed property: with knowledge of the regulations, it overturned them in all substantive respects except with regard to state-assessed property.

### III

█ Plaintiff next contends that even if the valuation rollback provision does not apply directly to the unit taxation of public utility property, it applies indirectly through the operation of article XIII, section 19. Specifically, plaintiff argues that by requiring public utility property to be "subject to taxation to the same extent and in the same manner as other property,"

article XIII, section 19, requires public utility property to be *valued* on the same basis as other property, and thereby effectively applies the valuation rollback provision to the unit taxation of public utility property. Because we conclude that article XIII, section 19, imposes no such equal-valuation requirement, we find plaintiff's argument to be untenable.

As stated, the purpose of article XIII, section 19, is broadly to authorize the unit taxation of public utility property (see *ITT World Communications, Inc.* v. *County of Santa Clara* (1980) 101 Cal.App.3d 246, 254 [162 Cal.Rptr. 186]; *Southern Cal. Tel. Co.* v. *Los Angeles, supra,* 45 Cal.App.2d 111, 123-125; see generally Bertane, *Public Utility Property, supra,* 20 UCLA L.Rev. 419), and more narrowly to "[a]ssure[] adequate valuation of utility property" (Plan for Tax Relief, *supra,* at p. 8).

By requiring that public utility property be "subject to taxation to the same extent and in the same manner as other property," article XIII, section 19, does not impose a requirement of equal valuation between public utility and other property, but simply specifies that public utility property, after it has been placed on the local tax rolls, be levied on at the same *rate* as locally assessed property, instead of being subject to a special gross receipts "in lieu" tax. In other words, this comparability requirement was not intended to apply to the *valuation* of public utility property, but only to its *taxation* after assessment.

The original language of present article XIII, section 19 (former art. XIII, § 14), clearly supports this conclusion.[6] After describing the property subject to Board assessment, the original language specified how the Board was to value public utility property, i.e., "at the actual value of such property." Then in a separate paragraph it provided that "[a]ll property so assessed . . . shall be subject to taxation to the same extent and in the same manner as other property." Thus, the original language and structure of present article XIII, section 19, clearly separated the *assessment* of public utility property from the *taxation* of such property, and required only that the property be *taxed* equally with other property and not that it be *valued* on the same basis.

---

[6]The original language read in relevant part: "All [covered property] . . . shall be assessed annually by the State Board of Equalization, at the actual value of such property. [¶] All property so assessed . . . shall be subject to taxation to the same extent and in the same manner as other property." The 1974 revision of this language was not intended to create any substantive changes. (See Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 5, 1974), argument in favor of Prop. 8, p. 31; Assem. Rep. on Proposed Revision of Article XIII (1974) 7 Assem. J. (1973-1974 Reg. Sess.) pp. 13237, 13269.) Consequently, the original language and the extrinsic aids relevant to construing it are also relevant to construing the present language.

The Legislature's official analysis of former article XIII, section 14, also supports the conclusion that present article XIII, section 19, was not intended to impose a requirement of equal valuation of public utility and other property. The analysis treats the subjects of taxation and assessment separately. It first notes that public utility property will be "return[ed] . . . to the local tax rolls to be taxed in the same way as other property is taxed . . . ." (Plan for Tax Relief, *supra,* at p. 8.) It then emphasizes that "adequate valuation of utility property [will be assured] by providing for its central assessment by the State Board of Equalization . . . ." (*Ibid.*) Thus, the official analysis also clearly separates assessment from taxation, and requires equality with regard only to the latter.[7]

To read an equal-valuation requirement into article XIII, section 19, would not only do violence to its language and run counter to the understanding of the Legislature that drafted it and the voters who adopted it, it would also result in the implied repeal of the very core of the provision. As explained above, the provision authorizes the unit taxation of public utility property, that is, the taxation of the property as a whole at its current value, undifferentiated into separate assets or even separate kinds of assets. If an equal-valuation requirement were read into the provision, it would effectively make the valuation rollback provision applicable to the taxation of public utility property. But if the valuation rollback provision were applicable, the following would result: first, public utility property could no longer be treated as a whole, but would necessarily be separated into real property assets (which would be within the scope of the provision) and personal property assets (which would not be); and second, the real property assets could no longer be valued annually at their current value, but would have to be valued at their 1975-1976 (or acquisition) value. In other words, each real and personal asset of a public utility would be treated and valued separately—a practice antithetical to the very concept of unit valuation. (Bertane, *Public Utility Property, supra,* 20 UCLA L.Rev. at pp. 442-443.)

The judgment is affirmed.

---

[7]The premise on which plaintiff bases its contention that article XIII, section 19, imposes an equal-valuation requirement is that the voters intended the provision to protect public utilities against discrimination in valuation and, consequently, taxation. This premise seems clearly to be false. First, the voters had no reason to consider the possibility of discrimination in valuation. When they adopted the predecessor of article XIII, section 19, the voters also constitutionalized the practice, already well established in California, of valuing property at its current "fair market value" (former art. XI, § 12, present art. XIII, § 1); they therefore had no reason to expect that the state might one day establish a lower value standard for common property. Second, the voters had no reason to wish to protect public utilities against discrimination in valuation: when they adopted the predecessor of article XIII, section 19, the belief was general that public utility property was undervalued. (Plan for Tax Relief, *supra,* at p. 8.)

Bird, C. J., Kaus, J., Broussard, J., Reynoso, J., Grodin, J., and Lucas, J., concurred.