[No. D038750. Fourth Dist., Div. One. Jan 7, 2003.]

COUNTY OF LOS ANGELES et al., Plaintiffs and Appellants, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent;
CITY OF LONG BEACH et al., Real Parties in Interest and Respondents.

**COUNSEL**

Lloyd W. Pellman, County Counsel, and Albert Ramseyer, Principal Deputy County Counsel, for Plaintiffs and Appellants.

Bill Lockyer, Attorney General, Richard W. Bakke, Deputy Attorney General, Gregory S. Price and Leslie Branman-Smith, Deputy Attorneys General, for Defendant and Respondent.

O'Melveny & Myers, Holly E. Kendig, Luc Moritz and Sabrina H. Strong for Real Parties in Interest and Respondents.

**OPINION**

**NARES, J.**—This appeal presents the question of whether defendant State Board of Equalization (the Board) properly equalized and adjusted the assessed value of certain rail transportation corridor properties owned by real parties in interest City of Long Beach and City of Los Angeles (together the Cities) but located outside their jurisdictional boundaries. In 1994, the Cities acquired from two railroad companies the subject property interests in the Alameda Corridor, which connects both the Port of Long Beach and the Port

of Los Angeles with a national transportation hub near downtown Los Angeles.

Article XIII,[1] section 11 of the California Constitution (discussed, *post*) limits the taxation of real property that is owned by a local government and located outside its jurisdictional boundaries (hereafter sometimes referred to as extraterritorial property) by restricting the maximum valuation of that land. Extraterritorial property is assessed for taxation purposes by the county in which it is located and is then equalized by the Board. Under section 11, subdivision (a) of article XIII, however, extraterritorial property is generally taxable only if it was "taxable when acquired."[2]

Here, portions of the subject Alameda Corridor property interests lie inside the Cities' jurisdictional boundaries and other portions lie outside those boundaries, but within the boundaries of plaintiff and appellant County of Los Angeles. In the grant deeds, the railroad companies reserved a perpetual easement on those acquired properties to enable them to continue to use the tracks for their rail freight operations.

After plaintiffs and appellants County of Los Angeles and Los Angeles County Assessor Rick Auerbach (together County) assessed the value of the acquired properties under section 11 of article XIII, the Cities filed applications for assessment equalization and adjustment with the Board, seeking a reduction in the assessed valuations.

A majority of the members of the Board found that the Cities' extraterritorial property interests were not "taxable when acquired" and thus those interests had a zero taxable value. The Board relied on the federal district court decision in *Atchison, Topeka & Santa Fe Railway Co. v. State Bd. of Equalization* (N.D.Cal., Sept. 7, 1994, No. C 89-4030 DLJ) 1994 WL 508836 (*Santa Fe*), which held that such interests were not taxable because the assessment of such interests violated the federal Railroad Revitalization and Regulatory Reform Act of 1976, 49 United States Code section 11501 (the 4-R Act), which prohibits discriminatory state taxation of railroad property.[3] The *Santa Fe* decision became final after the Ninth Circuit Court of Appeals dismissed the Board's appeal, and the United States Supreme Court denied the Board's petition for writ of certiorari.

---

[1] All further references to articles are to the California Constitution.

[2] See footnote 7, *post*.

[3] The 4-R Act prohibits the states from (among other things) "[a]ssess[ing] rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property" (49 U.S.C. § 11501(b)(1)) or "[i]mpos[ing] another

The County challenged the Board's decision on substantive and procedural grounds by filing a petition for peremptory writ of mandate in superior court. Upholding the Board's decision, the court denied the County's petition and entered judgment against it.

On appeal from the judgment, the County contends that (1) the subject properties were taxable when the Cities acquired them; (2) the Board's analysis misconstrued the *Santa Fe* decision; and (3) the County was denied procedural due process and the Board's decision is a nullity because State Controller Kathleen Connell erroneously delegated to Deputy Controller Richard Chivaro, who is not a member of the Board, Connell's constitutional obligation to participate in the "review, equalization and adjustment" of the subject assessments, in that Chivaro made the motion for adoption of the Board's findings and decision dated April 6, 2000. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1.  *The Cities' acquisition of the subject rail property interests*

In December 1994, the Cities jointly acquired interests in the subject properties (discussed, *post*) from Union Pacific Railroad Company (Union Pacific) and Southern Pacific Transportation Company (Southern Pacific) (together the Railroads) in anticipation of the development of a comprehensive transportation corridor, commonly known as the Alameda Corridor, for the purpose of improving the flow of cargo through both the Port of Long Beach and the Port of Los Angeles. The rail property in which the Cities acquired interests from Union Pacific is commonly known as the Union Pacific San Pedro Branch. The rail property in which the Cities acquired interests from Southern Pacific consists of Southern Pacific's San Pedro Branch and portions of Southern Pacific's Wilmington and Long Beach Branches.

These property interests acquired by the Cities consist of railroad rights-of-way and associated improvements such as rail structures, trackage and signals. The Cities have undivided fee title interests in only some of the Union Pacific and Southern Pacific rail properties, and they hold undivided easement interests in the remaining portions of the properties. Under the terms of the sale, Union Pacific and Southern Pacific retained the rights to use the tracks for their existing rail freight operations, certain fiber optic cable easements, and the fee simple interest in the land below 500 feet.

tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part" (49 U.S.C. § 11501(b)(4)).

The reported purchase price of the interests in the Union Pacific property was $75 million, and the price of the interests in the Southern Pacific property was $235 million.

The Cities purchased these property interests because they wanted to consolidate all port-related train traffic onto a single rail corridor that would be separated by a grade from all road vehicular and pedestrian traffic.

### 2. The Board's assessment

In California, real property is generally assessed locally by county assessors, under the supervision of the Board. Section 19 of article XIII, however, vests in the Board exclusive jurisdiction to assess "property . . . owned or used by regulated railway . . . companies operating on railways in the State . . . ."[4] Under that section, the Board classifies the property it assesses to the Railroads as either (1) "unitary" property, which is owned or leased property used in the Railroads' primary freight transportation operations, or (2) "nonunitary" property, which is property owned or leased by the Railroads, but not used or needed in their primary freight transportation operations. "Nonunitary" rail transportation property is commonly known as "NURPEFAR," an acronym for "Non-Unitary Rail Property Eligible For 4-R Act Relief."

Prior to the 1993 assessment year, the Board included the subject property interests in unitary assessments of the Railroads' property. The Board had not assessed any NURPEFAR prior to that year.

When the Railroads announced their intention to sell nonunitary rail transportation property rights in the subject property, the Board became aware of the existence of a market for such rights and assessed their value as NURPEFAR under section 19 of article XIII. Accordingly, in addition to assigning value to the Railroads' unitary rights in the same manner as in prior years, the Board's 1993 and 1994 assessments also assigned a value for the Railroads' NURPEFAR. The 1993 and 1994 NURPEFAR assessments did not alter or affect the methods the Board used in its 1993 and 1994 unitary assessments with respect to the properties. As already noted, the Railroads sold the nonunitary rail transportation property rights, or NURPEFAR, to the Cities in 1994.

---

[4]Section 19 of article XIII provides: "The Board shall annually assess . . . property . . . owned or used by regulated railway . . . companies operating on railways in the State . . . . This property shall be subject to taxation to the same extent and in the same manner as other property."

### 3. *The County's NURPEFAR assessment*

After the sale of these interests in the Alameda Corridor, the Los Angeles County Assessor assessed to the Cities the value of the Cities' NURPEFAR interests in the rail properties located outside their jurisdictional boundaries, based on the assessor's determination that they were taxable under section 11 of article XIII.

### 4. *Federal litigation*

In a series of federal lawsuits, all of which were consolidated (under case No. C 81-4365 DLJ) before the Honorable D. Lowell Jensen (Judge Jensen) of the United States District Court for the Northern District of California, the Railroads challenged the Board's assessment practices, contending the Board could not classify a property interest as NURPEFAR and tax it as such without violating the 4-R Act. One of the lawsuits, *Southern Pacific Transportation Co. v. State Bd. of Equalization* (N.D.Cal., July 27, 1993, No. C 89-3603 DLJ) 1993 WL 300081 (*Southern Pacific*) involved the NURPEFAR interest in the Alameda Corridor that the Cities acquired from Southern Pacific in the instant matter. In that action, Southern Pacific challenged the Board's assessments for various tax years, including 1993 and 1994, and sought declaratory and injunctive relief under the 4-R Act.

In September 1994, Judge Jensen issued findings of fact and conclusions of law in another one of the consolidated cases—*Santa Fe, supra,* 1994 WL 508836—and held that the Board's NURPEFAR assessments in that case violated the 4-R Act. Specifically, Judge Jensen found that only the Atchison, Topeka & Santa Fe Railway Company (Santa Fe Railway) and other owners of rail transportation property owned property that the Board classified as NURPEFAR, and the Board and various county defendants had assessed the subject NURPEFAR property after Santa Fe Railway rejected an offer by a consortium of counties to buy from it either tracks or trackage rights for the purpose of running commuter trains over the tracks. Judge Jensen also found in the *Santa Fe* case that the Board, the County, and various other counties in California had imposed a tax upon a class of Santa Fe Railway's property that was not imposed on other, nonrailroad property based on an unexercised "right" to dispose of its property in the future and, as a result of the classification of its property as NURPEFAR, had caused Santa Fe Railway to suffer an unfair or unreasonable tax burden. Judge

Jensen further found that the Board and the county defendants had discriminated against Santa Fe Railway in violation of section 306(d) of the 4-R Act[5] by imposing "any other tax" that had resulted in discriminatory treatment of a common carrier subject to the 4-R Act. Judge Jensen entered a partial judgment that permanently enjoined the Board from collecting taxes on Santa Fe Railway's NURPEFAR for the tax years 1989 through 1992 and ordered the defendants to pay Santa Fe Railway a refund of more then $3 million for ad valorem taxes paid for those years.

Shortly thereafter, in December 1994, Judge Jensen made a parallel ruling in the *Southern Pacific* case (discussed, *ante*) when he entered a stipulated order for a preliminary injunction against the 1993 and 1994 NURPEFAR assessments of the Alameda Corridor and against any attempt by the County to collect any ad valorem tax related to those assessments. In September 1998, Judge Jensen made the *Southern Pacific* preliminary injunction permanent.

The Board unsuccessfully appealed the decisions in the *Southern Pacific* and *Santa Fe* cases to the United States Court of Appeals for the Ninth Circuit. In January 2000, the United States Supreme Court denied the Board's petitions for a writ of certiorari in the *Southern Pacific* and *Santa Fe* cases.

### 5. *The Cities' applications for equalization*

The Cities filed with the Board separate applications for review, equalization and adjustment for tax year 1997-1998 (the applications). The Cities claimed that the County had no jurisdiction under section 11 of article XIII to assess their interests in the Alameda Corridor. They also claimed (among

---

[5]Section 306 of the 4-R Act was previously codified at 49 United States Code section 11503. (See *Department of Revenue of Ore. v. ACF Industries, Inc.* (1994) 510 U.S. 332, 336 [114 S.Ct. 843, 846, 127 L.Ed.2d 165].) That section is now codified at 49 United States Code section 11501. (*Burlington Northern and Santa Fe Ry. Co. v. Burton* (10th Cir. 2001) 270 F.3d 942, 944.) The relevant portion of 49 United States Code section 11501 provides in subpart (b): "The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them: [¶] (1) Assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property. [¶] (2) Levy or collect a tax on an assessment that may not be made under paragraph (1) of this subsection. [¶] (3) Levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction. [¶] (4) Impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part."

other things) that the Board had exclusive assessment jurisdiction under section 19 of article XIII to assess all interests in the Alameda Corridor to the Railroads, and the County Assessor had erred in assessing or valuing the subject property interests because those interests were properly assessable in full to the Railroads under that section.

The Board bifurcated the application proceedings into two phases. In the first phase, which dealt with jurisdictional issues, the Board determined that the Cities and the Railroads have "separate identifiable interests" in the Alameda Corridor over which the County and the Board have "independent assessment authority." The Board also determined that section 11 of article XIII "governs the assessment of the Cities' separate identifiable interests"; section 19 of article XIII "governs the assessment of the Railroad[s'] separate identifiable interests"; and "in view of the separate taxable interests, the law requires that the Cities be assessed for their interests and the Railroad[s] be assessed for [their] interests."

The second phase of the application proceedings, which dealt with valuation issues, was held in December 1999, before the United States Supreme Court denied the Board's petitions for a writ of certiorari in the *Southern Pacific* and *Santa Fe* cases (discussed, *ante*). At the conclusion of the hearing, the Board took the matter under submission and scheduled another public hearing on February 24, 2000, for issuance of its findings and decision.

On January 18, 2000, the United States Supreme Court issued the orders denying the Board's petitions for writ of certiorari in the *Southern Pacific* and *Santa Fe* cases. Counsel for the Cities thereafter sent a letter to the Board requesting that the Supreme Court's orders be made part of the record in the pending application proceedings.

6. *The Board's decision*

At the public hearing conducted on February 24, 2000, the Board took official notice of the Supreme Court orders denying the Board's petitions for a writ of certiorari in the *Southern Pacific* and *Santa Fe* cases. A majority of the members of Board, including State Controller Kathleen Connell, found that the Cities' interests in the subject Alameda Corridor properties were not taxable when acquired and thus had a zero taxable value under section 11 of article XIII.

The Board then directed its staff to draft findings and a decision consistent with its decision at the hearing. The Board scheduled a public hearing for April 6, 2000, at which the Board approved and adopted the findings and decision. Deputy Controller Richard Chivaro appeared for State Controller Connell, who was not present at the hearing, and voted to approve the findings and decision. The Board's written "Findings and Decision of the Board" (the Board's decision) expressly incorporated by reference the Supreme Court orders denying the Board's petitions for a writ of certiorari in the *Southern Pacific* and *Santa Fe* cases,[6] and held: "Based on the district court's order, the Cities' interests in the subject properties were not taxable when acquired within the meaning of Section 11 of Article XIII. Therefore, the taxable value of those interests in the subject properties purchased by the Cities is zero."

In addition to the applications already discussed, the Cities also filed annual applications for review, equalization and adjustment of later year assessments. The Board determined that the facts and issues set forth in these additional applications were the same as those raised in the prior applications, and decided the new applications based upon its prior decision. Accordingly, at public hearings held in July 2000 and February 2001, the Board determined by a majority vote of the members present and voting that the Cities' interests in the Alameda Corridor were not taxable when acquired by the Cities, and thus were not taxable under section 11 of article XIII.

---

[6]The Board's decision stated in part: "Prior to 1993, the Board only assessed the fee interests in the properties to the Railroads as unitary and nonunitary property owned or used by the Railroads pursuant to Section 19 [of article XIII]. In 1993, when the Railroads announced their intention to sell the properties to the Cities, the Board classified the subject properties as NURPEFAR. The Board assessed the added value of those interests in 1993 and 1994 prior to the sale to the Cities. Thereupon, the Railroads brought actions contending that those assessments were discriminatory in violation of the 4-R Act and sought to enjoin the assessments. The Railroads' case was consolidated with the case of the *The Atchison, Topeka & Santa Fe Railway Company v. State Board of Equalization*, which raised the same issue involving the taxability of similar properties. [¶] On September 7, 1994, the federal district court entered findings of fact and conclusions of law in the *Santa Fe* case permanently enjoining the defendants Board and counties from 'collecting or seeking to collect any taxes on Subject Property for the tax years at issue'. In December 1994, the district court entered a stipulated preliminary injunction that enjoined the defendants Board and counties from 'collecting or seeking to collect any *ad valorem* taxes billed for the 1993 and 1994 tax years as to [the subject properties] pending determination of the action.' *At the direction of the Ninth Circuit Court of Appeals, the district court on September 16, 1998 entered judgment in favor of the Railroads and ordered that the preliminary injunctions for 1993 through 1996 become permanent. The United States Supreme Court's denial of the Board's petition for a writ of certiorari had the effect of rendering final the district court's order permanently enjoining the assessment and collection of taxes for the subject properties.*" (Italics added.)

### 7. County's petition for writ of mandate

In September 2000, the County challenged the Board's decision on substantive and procedural grounds by filing an amended petition for peremptory writ of mandate under section 1094.5 of the California Code of Civil Procedure (the petition). In the petition, the County alleged that (1) the Board's decision to reduce the assessed values of the Cities' property was invalid because the Board did not conduct a fair proceeding and "otherwise prejudicially abused its discretion in establishing the assessment of the [Alameda] Corridor at zero . . . ."; (2) the Board abused its discretion and otherwise denied the County a fair hearing by "issuing findings of fact that reflect a determination that is arbitrary and capricious, contrary to law, and otherwise barred by the doctrine of collateral estoppel"; and (3) the Board's equalization of the Alameda Corridor at a zero value is not supported by substantial evidence. The County requested the issuance of a writ of mandate commanding the Board to vacate its decision and remand the various applications to the Board for a new hearing. The petition did not challenge any aspect of the Board's jurisdictional decision in the first phase of the proceedings.

On June 14, 2001, the court issued an order denying the petition. The court found that the Board had not proceeded without or in excess of jurisdiction, the trial was fair, and the Board had not committed prejudicial abuse of discretion. The court expressly ruled that, based on the evidence presented, "the Board properly found the properties transferred to the Cities were not taxable when acquired." The County's timely appeal followed.

### STANDARD OF REVIEW

"In reviewing the trial court's ruling on a writ of mandate, the appellate court is ordinarily confined to an inquiry as to whether the findings and judgment of the trial court are supported by substantial, credible and competent evidence." (*Rodriguez v. Solis* (1991) 1 Cal.App.4th 495, 502 [2 Cal.Rptr.2d 50].) On questions of law arising in mandate proceedings, the appellate court may make its own determination as an exercise of independent judgment. (*Bunnett v. Regents of University of California* (1995) 35 Cal.App.4th 843, 849 [41 Cal.Rptr.2d 567].)

### DISCUSSION

### I. The Subject Properties Were Not Taxable When Acquired

In the underlying mandate proceeding, the County unsuccessfully challenged the Board's decision that the Cities' interests in the subject extraterritorial Alameda Corridor properties, which the Cities had acquired from the

Railroads, were not taxable when acquired and thus had a zero taxable value under section 11 of article XIII. On appeal, the County contends the court's denial of its petition for writ of mandate on substantive grounds was erroneous because (1) the Board's analysis misconstrued the *Santa Fe* decision, and (2) the subject properties were taxable when the Cities acquired them. We conclude that the decisions by the Board and the court that the Cities' interests in the Alameda Corridor were not taxable when acquired for purposes of section 11 of article XIII, are supported by substantial evidence and are correct as a matter of law.

A. *Constitutional and Statutory Framework of Assessment, Equalization and Taxation Under Unit Valuation Principles*

Section 1, subdivision (a) of article XIII provides that "[u]nless otherwise provided by *this Constitution or the laws of the United States*: [¶] . . . [a]ll property is taxable and shall be assessed at the same percentage of fair market value." (Italics added.)

The California Constitution does provide "otherwise" in section 3, subdivision (b) of article XIII (hereafter section 3(b)), which generally exempts public property from taxation by providing: "The following are exempt from property taxation: [¶] . . . [¶] (b) Property owned by a local government, *except as otherwise provided in Section 11[, subdivision] (a)*." (Italics added.)

1. *Section 11 of article XIII and the "Phillips factor"*

In California, to the extent real property owned by a local government and located outside its jurisdictional boundaries is taxable, such property is generally assessed for taxation purposes by the county in which it is located and is then equalized by the Board. Section 11, subdivision (a) of article XIII (hereafter section 11(a)) creates an exception to the public property exemption set forth in section 3(b) (discussed, *ante*) by providing that "[l]ands owned by a local government that are outside its boundaries, including rights to use or divert water from surface or underground sources and *any other interests in lands*, are taxable if . . . they are located outside Inyo or Mono County and were *taxable when acquired* by the local government. . . ." (Italics added.) Thus, under section 11(a) a local government's extraterritorial property is taxable only if the property was "taxable when acquired."

■ The purpose of section 11 of article XIII is to ensure comparable taxation of extraterritorial property and privately owned real property. (*City and County of San Francisco v. County of San Mateo* (1995) 10 Cal.4th 554, 569 [41 Cal.Rptr.2d 888, 896 P.2d 181] (*San Francisco*).) Under that section,

real property owned by a local government and located outside its jurisdictional boundaries cannot be assessed at a higher value than the value at which those same lands would be assessed if owned by a private landowner. (*Ibid.*)

■ Subdivision (b) of section 11 of article XIII (hereafter section 11(b)) limits the taxation of such extraterritorial property by restricting the *maximum valuation* of that land.[7] (*San Francisco, supra,* 10 Cal.4th at p. 560.) Specifically, section 11(b) limits valuation of extraterritorial lands located outside of Mono and Inyo Counties, such as the Cities' property interests in the Alameda Corridor at issue in the instant case, to the lower of either (1) the fair market value as assessed by the taxing county or (2) a figure derived by multiplying the 1967 assessed value times the "Phillips factor" reflecting the general increase in land values in California since 1967. (*San Francisco, supra,* 10 Cal.4th at p. 569.) The "Phillips factor" is the ratio of the statewide per capita assessed value of land (as of the last lien date prior to the current lien date) to $856. (*Id.* at p. 561.)

2. *Section 19 of article XIII and the four-step "unit valuation" system of assessment and equalization*

Notwithstanding the provisions of section 11 of article XIII, section 19 of that article vests in the Board exclusive jurisdiction to assess "property . . . owned or used by regulated railway . . . companies operating on railways in the State"[8] under what is known as the system of "unit" or "unit valuation" taxation.[9] (See *ITT World Communications, Inc. v. City and County of San Francisco* (1985) 37 Cal.3d 859, 862-864 [210 Cal.Rptr. 226, 693 P.2d 811] (*ITT*); Rev. & Tax. Code, § 723 (discussed, *post*).)

Critical to an understanding of "unit valuation" taxation are the concepts of "unitary property," "nonunitary property," and the valuation of regulated railway properties as "units" or "going concerns." ■ The California Supreme Court has explained that "unit taxation is properly characterized not as the taxation of real property or personal property or even a combination of both, but rather as the taxation of property *as a going concern*." (*ITT, supra,* 37 Cal.3d at p. 864.)

---

[7]Section 11(b) provides in part: "Taxable land belonging to a local government and located outside of Inyo and Mono counties shall be assessed at the place where located and in an amount that does not exceed the lower of (1) its fair market value times the prevailing percentage of fair market value at which other lands are assessed and (2) a figure derived in the manner specified in this Section for land located in Mono County."

[8]See text in footnote 4, *ante.*

[9]Other synonymous terms include "unit method," "unit concept," and "unit approach." (See the Board's State Assessment Manual (Nov. 2000 ed.) at p. 15.)

Revenue and Taxation Code section 723, which authorizes the Board to use the principle of "unit valuation" in its assessments of regulated railway properties, defines the terms "unitary property" and "nonunitary property." Revenue and Taxation Code section 723 provides in full: "The board may use the principle of *unit valuation* in valuing properties of an assessee that are *operated as a unit in a primary function of the assessee.* When so valued, those properties are known as *'unitary property.'* Property of an assessee not valued through the use of the principle of unit valuation are known as *'nonunitary property.'* When valuing nonunitary property, the board shall consider current market value information of comparable properties provided by the assessor just prior to the reappraisal by the board of that property." (Italics added.)

The Board's State Assessment Manual (hereafter the Manual) explains that "[t]he property of 'regulated railways' is specifically enumerated in section 19 . . . as subject to state assessment. All railways are regulated in that they are subject to safety and common carrier regulation by the United States Department of Transportation." (Manual, *supra,* at p. 5.) The Manual also explains that " 'the [unitary valuation] concept assumes that it is meaningless to consider the value of a mile of track, a substation, or a reel of cable standing apart from the entire operating system. The unit value of the enterprise may be either more or less than the total value of the individual assets making up the whole. Presumably, if each asset were sold separately, the total price received would be substantially less than the value of the enterprise as a *going concern.'* " (*Id.* at p. 15, italics added.) The Manual defines "unitary property" as "property owned or leased by the state assessee and *used in its primary operations as part of the state-assessee's integrated system*" and "nonunitary property" as "property that is owned by the state assessee but *not used in the assessee's primary operations.*" (*Id.* at pp. 18-19, italics added.) The Manual specifically cites "railroad easements for rights-of-way" as an example of unitary property. (*Id.* at p. 19.)

The *ITT* court explained the four steps involved in unit taxation of public utility property. "First, the Board annually assesses all unitary property of each public utility, that is, all property that it uses in performing its function. ([Rev. & Tax. Code,] § 723.) In making this assessment, the Board uses the principle of unit valuation: it determines the value of the property as a whole, rather than the value of any of the assets as parts of the whole; it does not assess each asset and then total up the valuation, but values the property as a unit, primarily through a *capitalized earnings approach.*" (*ITT, supra,* 37 Cal.3d at p. 863, fn. omitted, italics added.) In an explanatory footnote, the high court explained that, "[i]n using a *capitalized earnings*

*approach*, the Board (1) calculates the net operating income of the taxpayer; (2) determines an appropriate capitalization rate, which is the equivalent of a reasonable rate of return; and (3) divides net operating income by the capitalization rate to determine unitary value. The Board uses such an approach to determine the unitary value of public utility property because market data are practically nonexistent: public utilities are rarely bought and sold." (*Id.* at p. 864, fn. 3.)

The *ITT* court then explained the second through fourth steps involved in unit taxation: "Second, the owner of the public utility property is offered an opportunity to apply for corrections. ([Rev. & Tax. Code,] §§ 731, 741-749.) Third, the Board transmits to the local taxing authority a roll showing the assessments against public utility property situated within its jurisdiction. ([Rev. & Tax. Code,] §§ 755-756, 758.) In accordance with the principle of unit valuation, such assessments do not represent the value of the assets situated within that jurisdiction; rather, they represent the share of the value of the property as a whole that the Board has determined should equitably be allocated to the jurisdiction. Thus, after it has assessed the value of the property as a whole, the Board makes a formulary allocation that has little or no relationship to the actual fair market value of the particular assets situated within the jurisdiction. Fourth, the local taxing authority subjects the property so assessed to taxation at the rate fixed in its jurisdiction. (See [Rev. & Tax. Code,] §§ 755-756.)" (*ITT, supra,* 37 Cal.3d at p. 864.)

### 3.   *4-R Act*

The 4-R Act (discussed, *ante*) prohibits discriminatory state taxation of railroad property. In the interest of clarity and convenience, we reiterate that the 4-R Act prohibits the states from (among other things) "[a]ssess[ing] rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property" (49 U.S.C. § 11501(b)(1)) or "[i]mpos[ing] another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Board under this part" (49 U.S.C. § 11501(b)(4)).

### B.   *Analysis*

The issue presented is whether the court properly found in the mandate proceedings that the subject Alameda Corridor property interests that the Cities purchased from the Railroads were not taxable when acquired within the meaning of section 11 of article XIII and thus had a zero taxable

value. We conclude the court's determination is supported by substantial evidence in the record and the federal district court decisions in the *Southern Pacific* and *Santa Fe* cases, and therefore must be upheld.

The record shows that when the Railroads announced their intention to sell nonunitary rail transportation property rights in the subject property, the Board became aware of the existence of a market for such rights, and assessed their value as NURPEFAR under section 19 of article XIII.

In addition to assigning value to the Railroads' unitary rights in the same manner as in prior years, the Board's 1993 and 1994 assessments also assigned a value for the Railroads' NURPEFAR.

The Railroads sold the NURPEFAR nonunitary rail transportation property rights to the Cities in 1994. After the sale of these interests in the Alameda Corridor, the Los Angeles County Assessor assessed to the Cities the value of the Cities' NURPEFAR interests in the rail properties located outside their jurisdictional boundaries, based on the assessor's determination that they were taxable under section 11 of article XIII. The Railroads then challenged the Board's assessment practices by bringing the underlying consolidated federal lawsuits, contending the Board could not classify a property interest as NURPEFAR and tax it as such without violating the 4-R Act. One of the lawsuits, *Southern Pacific*,[10] involved the NURPEFAR interest in the Alameda Corridor that the Cities acquired from Southern Pacific in the instant matter.

In September 1994, the federal district court issued findings of fact and conclusions of law in another one of the consolidated cases, *Santa Fe*,[11] and held that the Board's NURPEFAR assessments in that case violated the 4-R Act. The district court found that only the Santa Fe Railway and other owners of rail transportation property owned property that the Board classified as NURPEFAR. The district court also found that the Board, the County, and various other counties in California had imposed a tax upon a class of Santa Fe Railway's property that was not imposed on other, non-railroad property and had caused Santa Fe Railway to suffer an unfair or unreasonable tax burden. It further found that the Board and the county defendants had discriminated against Santa Fe Railway in violation of section 306(d) of the 4-R Act[12] by imposing "any other tax" that had resulted in discriminatory treatment of a common carrier subject to the 4-R Act.

[10]*Southern Pacific, supra,* 1993 WL 300081.
[11]*Santa Fe, supra,* 1994 WL 508836.
[12]See footnote 5, *ante.*

Accordingly, the federal court entered a partial judgment that permanently enjoined the Board from collecting taxes on Santa Fe Railway's NURPE-FAR for the tax years 1989 through 1992 and ordered the defendants to pay Santa Fe Railway a refund of more then $3 million for ad valorem taxes paid for those years. Shortly thereafter, in December 1994, the district court made a parallel ruling in the *Southern Pacific* case (discussed, *ante*) and entered a stipulated order for a preliminary injunction against the 1993 and 1994 NURPEFAR assessments of the Alameda Corridor and against any attempt by the County to collect any ad valorem tax related to those assessments. The federal court thereafter made the *Southern Pacific* preliminary injunction permanent.

The Board unsuccessfully appealed the decisions in the *Southern Pacific* and *Santa Fe* cases to the United States Court of Appeals for the Ninth Circuit. In January 2000, the United States Supreme Court denied the Board's petitions for a writ of certiorari in the *Southern Pacific* and *Santa Fe* cases. The district court decisions in those cases are thus final.

At the public hearing conducted on February 24, 2000, on the Cities' applications for assessment and adjustment, the Board's majority found that the Cities' interests in the subject properties were not "taxable when acquired" within the meaning of section 11 of article XIII and thus had a zero taxable value.

The reporter's transcript of that hearing shows that the Board majority took official notice of the Supreme Court orders denying the petitions for a writ of certiorari in the *Southern Pacific* and *Santa Fe* cases.

The final *Southern Pacific* and *Santa Fe* decisions are dispositive with respect to the instant appeal. By holding that the Board and the various county defendants had discriminated against regulated railways by classifying and assessing the subject properties as NURPEFAR, those decisions support the Board's finding that the Cities' Alameda Corridor property interests were not taxable when acquired for purposes of section 11 of article XIII as a matter of law. The legal import of those decisions is that the assessment and taxation of the Cities' NURPEFAR property interests violates the federal 4-R Act.

The County contends the Board misconstrued the district court's *Santa Fe* decision. Specifically, it asserts that "[i]n no sense did the District Court conclude that the subject railroad property was exempt from taxation." The County maintains that the *Santa Fe* court determined instead that the property was assessed twice, once as part of Santa Fe Railway's unitary property,

and again as NURPEFAR, and it was this "double taxation" that the district court concluded was a discriminatory practice that violated the 4-R Act.

We reject the County's contention. In its written *Santa Fe* opinion, the district court did make a finding of fact that "[f]or tax years 1989 through 1992, all of the Subject Property was taxed as part of Santa Fe's unitary property and again as NURPEFAR." A close reading of the *Santa Fe* opinion, however, shows that the district court did not base its decision that taxation of NURPEFAR violated the 4-R Act on the ground that such taxation constituted a "double assessment." In its written opinion, the federal court clearly stated that "the issue is whether the imposition of this tax violates Section 306(1)(d)[13] of the 4-R Act." (*Santa Fe, supra,* 1994 WL 508836, at *5.) In support of its determination that the taxation of the subject property as NURPEFAR violated the 4-R Act, the district court made a finding of fact that the Board and the various county defendants "ha[d] imposed a tax upon a class of Santa Fe's railroad property that was not imposed on other, non-railroad property." (*Id.* at *4.) The district court also made a factual finding that "no other similarly situated taxpayers ha[d] been taxed in a manner similar to Santa Fe or other railroads. . . ." (*Ibid.*) In its "Conclusions of Law," the *Santa Fe* court determined that "California law does not recognize or permit the classification of property the [Board] has labelled NURPEFAR," and the defendants "ha[d] discriminated against Santa Fe in violation of subsection 306(1)(d) by imposing 'any other tax' that results in discriminatory treatment of a common carrier subject to the 4-R Act." (*Santa Fe, supra,* 1994 WL 508836, at *6.) By permanently enjoining such taxation, the district court held that the NURPEFAR interests were not taxable. The practical import of the *Santa Fe* decision is that such property interests are exempt from taxation.

Substantial evidence shows that those NURPEFAR assessments did not alter or affect the methods the Board used in its 1993 and 1994 unitary assessments with respect to the subject properties. Substantial evidence also shows that before the Railroads' sale of the subject properties to the Cities, the Board had included the properties in its assessments as part of the Railroads' unitary property; after the sale, the Board continued to assess, and the County continued to collect, taxes on the Alameda Corridor property on the same unitary basis as before. The record thus supports the Cities' assertion that "[t]he transfer of the partial interest, or NURPEFAR, to the Cities, therefore, has not resulted in any loss of tax revenues for the County."

The County also contends the Board's finding that the Cities' property interests in this matter had a zero taxable value is fatally flawed because of

---

[13]See footnote 5, *ante.*

the two railroads, "[o]nly [Southern Pacific] received a NURPEFAR assessment for 1997," and thus "the Board's analysis of the District court's striking of certain non-unitary assessments cannot be determinative as to the value of [Union Pacific] railroad property sold to the Cities as the [Board's] staff admits that this was subject to unitary assessment." The Board responds, without citation to the record, that it separately assessed Union Pacific's unitary and nonunitary property under Revenue and Taxation Code section 723 (discussed, *ante*), and "[t]he only reason the [Board] did not assess the nonunitary Alameda Corridor interests to Union Pacific in 1993 and 1994, is that the [Board's] staff was unaware at that time that those interests were being offered for sale."

The County's contention is unavailing. We are persuaded that the federal district court's dispositive decisions in the *Southern Pacific* and *Santa Fe* cases make clear that any assessment of the nonunitary property interests that the Cities acquired from Union Pacific would have violated the 4-R Act, and thus the Board and the court properly determined that those property interests were not taxable when acquired within the meaning of section 11 of article XIII.

## II. *No Improper Delegation of Powers*

The County also contends it was denied procedural due process, and thus the Board's decision is a nullity, because State Controller Kathleen Connell improperly delegated to Deputy Controller Richard Chivaro, who is not a member of the Board, Connell's constitutional obligation to participate in the "review, equalization and adjustment" of the subject assessments. The County maintains that Chivaro had no authority to make his motion for adoption of the Board's findings and decision dated April 6, 2000. We reject these contentions.

The record shows that during the public hearing on February 24, 2000, the Board took official notice of the Supreme Court orders denying the Board's petitions for writs of certiorari in the *Southern Pacific* and *Santa Fe* cases. The record also shows that a majority of the members of Board, including State Controller Connell, voted to approve the determination that the Cities' interests in the subject Alameda Corridor properties were not taxable when acquired, and thus had a zero taxable value under section 11 of article XIII. The Board then directed its staff to draft findings and a decision consistent with its decision at the hearing.

The Board scheduled a public hearing for April 6, 2000, at which the Board approved and adopted the findings and decision. Deputy Controller

Chivaro appeared for Connell, who was not present at the hearing, and voted to approve the written findings and decision.

By voting to adopt the written findings and decision in an exercise of authority that Connell delegated to him, Chivaro was not deciding the matter, as the County contends, and thus there is no showing that Connell erroneously delegated her constitutional obligation to participate in the review, equalization and adjustment of the subject assessments. The County has cited no constitutional or statutory provisions that obligates the State Controller to personally approve and sign the written findings and decision. We thus conclude the court did not err when it ruled that "there was no improper delegation of power when the Deputy Controller participated in the adoption and issuance of the Board's findings."

## DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and McIntyre, J., concurred.